BALONICK LAW OFFICE, INC.

Barney Balonick (SBN#277776)
10100 Santa Monica Blvd #1700
Los Angeles, CA 90067
310.703.1755
310.703.1799 (facsimile)
*bhb@balonicklaw.com*

Attorneys for Plaintiffs
SHOELOGICS, KOREA;
TAN AN T&C CO., LTD.
aka (MH factory)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHOELOGICS KOREA, a Korean-based limited company and successor-in-interest to SHOELOGICS, LTD.; TAN AN T&C CO., LTD., a Vietnamese limited company; <br><br>    Plaintiffs, <br> vs. <br> THE WALKING COMPANY, INC., a Delaware corporation; and DOES 1 through 50, inclusive <br><br>    Defendants. | Case No.: <br><br><br> Hon. <br> Dept. <br><br> Date Action filed:  August 14, 2019 <br> Trial Date:  N/A <br><br><br> COMPLAINT FOR BREACH OF CONTRACT; DETRIMENTAL RELIANCE; UNFAIR/DECEPTIVE BUSINESS PRACTICE BUS. & PROF. CODE 17200, ET SEQ.; |

Plaintiffs SHOELOGICS KOREA, ("SHOELOGICS"), and TAN AN T&C

CO., LTD,("MH factory" or "TAN AN" respectively and/or "Plaintiffs"), by and

through its attorneys, based on its own experience and investigation and the

independent investigation of counsel and information and belief, alleges against the

Defendant THE WALKING COMPANY, INC., ("Defendant" and/or "TWC") as

follows:

## NATURE OF THE ACTION

1. The Defendant owes the Plaintiffs $1,718,223.92 (the "Debt"). The Defendant

intentionally and without justification refuses to pay the Debt which stems from

the orders of footwear the Defendant placed with the Plaintiffs. As part of its

deceptive business practice, the Defendant engages companies such as the

Plaintiffs to create and develop these designs in liaison with the Defendant's

company to an agreed specification, and then manufacture shoes to be sold at the

Defendant's various stores. That is the case here and that is precisely what the

Defendant did to the Plaintiffs. Instead of keeping its promises to pay the Plaintiffs

for the footwear they designed and manufactured for the Defendant, however, the

Defendant breached the Contract, kept the Plaintiffs' inventory both in their USA

warehouse (and in transit), and in the factory unit in stock or in actual manufacture.

Upon information and belief, the Defendant is likely taking the Plaintiff's

developed products and designs so that it can be manufactured and sold at a more cost-effective rate.

2. The Plaintiffs will show, and the evidence will prove that Defendant engaged the Plaintiffs (pursuant to the attached Sourcing Agreement (the "Agreement" and/or "Contract")) (See Att. Ex. "A" to the Complaint and incorporated by reference) to develop and manage the production of their footwear. Specifically, the Defendant engaged SHOELOGICS to develop and commercialize footwear lines, and also authorized SHOELOGICS to engage a factory (MH Factory) to manufacture and produce the Defendant's products. The Defendant placed vast amounts of orders for these shoes to be produced at the Defendant's specifications. These orders were made through purchase orders. Even though the Plaintiffs produced the Defendant's products pursuant to the purchase orders, the Defendant refuses to pay despite the Plaintiffs' repeated requests and the Plaintiffs have incurred significant financial losses proximately caused by the Defendant's breach of the contract. Specifically, the Defendants owe the Plaintiffs *$1,718,223.92* (the "Debt"). The Debt includes the funds owed to SHOELOGICS ($235,063.04) and for the Tan An T&C Co. (MH factory), engaged to produce the Defendant's product ($1,483.160.88). Attached as Ex. "B" and incorporated by reference are spread sheets and invoices prepared by the Plaintiffs which support the contentions evidencing the Debt. The Plaintiffs' costs and lost profits were proximately caused

by the Defendant's abrupt and unjustified cancellation of the Contract. Plaintiffs now seek a judgment against the Defendant for the full amount of the Debt.

## JURISDICTION AND VENUE

3. This is an action for breach of contract, detrimental reliance, and violation of Bus. & Prof. Code § 17200. This Court has jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship and the Defendant owes the Plaintiff $1,718,223.92. Clearly, there is more than $75,000.00 in controversy.

4. This Court has personal jurisdiction over the Defendant and venue in this jurisdiction is proper pursuant to Rule 4 of the Federal Rules of Civil Procedure because; (1) Defendant regularly transacts and conducts business in the City of Los Angeles, County of Los Angeles; (2) Defendant's conduct and acts giving rise to this action occurred and has occurred in the City of Los Angeles, County of Los Angeles; and/or (3) the Defendant should have expected to be subject to the jurisdiction of the California courts wherein the Contract stipulates that this Court is the proper jurisdiction (Ex. "A", Contract, ¶ 40).

5. The amount in controversy exceeds $75,000.00 Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1331 (b)(2) as a substantial part of the events or omissions giving rise to the action occurred in this judicial district.

## **THE PARTIES**

6. SHOELOGICS is, and at all times relevant hereto a private company currently based in South Korea.[1]

7. TAN AN (MH) is a limited company based in Vietnam.

8. Defendant, The Walking Company, Inc., is a Delaware corporation with retail stores located in Los Angeles, California, and other counties in California as well. Defendant's principal executive office is in Santa Barbara, California.

9. Plaintiff is ignorant of the true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 50, inclusive. Such fictitious defendants are sued pursuant to the provision of Section 474 of the California Code of Civil Procedure. Upon information and belief, each fictitious defendant was in some way responsible for, participated in, or contributed to the matters and things of which Plaintiff complains herein, and in some fashion has legal responsibility therefor. When the exact nature and identity of such fictitious defendants' responsibility for, participation in, and contribution to the matters and things herein alleged is ascertained by Plaintiff, Plaintiff will seek to amend this Complaint and all proceedings herein to set forth the same.

---

[1] SHOELOGICS, Ltd., was a company based in Hong Kong. It was dissolved in 2015 and the debts and assets of SHOELOGICS, Ltd., was transferred to SHOELOGICS, Korea. Transfer documents are available upon request.

**FACTUAL ALLEGATIONS**

10. This is an action to collect on the Debt owed by the Defendant.

11. Starting around 2012, SHOELOGICS acted as the Defendant's agent and produced footwear product at the Defendant's request for years. Prior to 2018, the Defendant filed for Chapter 11 bankruptcy protection (SHOELOGICS was the Defendant's agent before the bankruptcy was granted and lost approximately $900,000.00) but before 2018, the Defendant's shoes were manufactured in a factory called HPC also in Vietnam. The Defendant's bankruptcy plan was approved, but HPC Factory would not again trust the Defendant to continue with payments going forward and subsequently refused to continue business and gave the Defendant notice to quit their factory. Starting around mid-2018, another factory Tan An (MH) took over the development and manufactured the product for the Defendant, all with the Defendant's full knowledge and agreement. The Defendant had at all times direct control of monitoring the shoes including but not limited to: where they are made, how they are made, and when they are made. They had worked in close conjunction with SHOELOGICS, and at all times herein, the Defendant never objected to MH acting as the factory until it terminated the Contract. Upon information and belief, the Defendant will likely defend the instant case by claiming that the Plaintiffs produced non-conforming footwear. The

Defendant, however, refused to let the Plaintiffs cure any alleged defect and the Plaintiffs expect to prove that any claims of non-conforming goods were made in bad faith.

12. Decisions that directly impacted the Defendant's products were always discussed between Defendant and SHOELOGICS. SHOELOGICS developed the Defendant's products based on the Defendant's designs, and SHOELOGICS was never responsible for any costs other than local costs as defined the Contract. The cost of development was covered by the income generated by the purchase orders made and delivered.

13. Earlier this year (around May 2019), some of Defendant's officers (an individual named Mr. Eugene Kim and the Defendant's vice president, Ms. Susie Minier) went to the Plaintiff's factory in Vietnam and talked openly about placing new orders and in open meetings provided assurances to the owners of SHOELOGICS and the factory that they (the Plaintiffs) were doing a good job and never indicated that any past orders were non-conforming. As it turns out, the assurances by Mr. Kim during this visit were likely made to induce the Plaintiff to not only ship products but to continue to develop and manufacture more. Indeed, these false assurances were used to lure the Plaintiffs into continuing to develop styles urgently with the promise of much higher quantities of shoes being placed for production for the Defendant's company but at a lower price of $18.00.

Apparently, the Defendant (through Mr. Kim's verbal assurances) again in open meetings in Vietnam instigated urgent designs and development for these new "core" products at a base price of $18.00. The |defendant's designer, Mr. Michael Craven, was in the Vietnamese factory having been told by Mr. Kim to stay there in Vietnam for that specific reason and not to travel to China as planned.

14. Mr. Kim maintained and assured everyone in this meeting that "... so long as you [the Plaintiffs] could produce shoes at this $18.00 base price, then we [the Defendant] will place orders of at least 100,000 units per season over the 3 new core styles..." But for the assurance by Mr. Kim, the Plaintiffs would have never agreed to undertake these orders – the Defendant recently cleared itself of bankruptcy proceedings and only because of the guarantee of future shipments did the Plaintiffs agree to fill the Defendant's orders.

15. The Plaintiffs relied on Mr. Kim's promises and therefore urgently helped design, develop and re-engineer the new core products working long hours at greatly increased costs to follow Mr Kim's instructions in an expeditious manner.

16. The TanAn factory has, and indeed still had been, in the process of manufacturing  pre-ordered products from their signed invoices for the Defendant; all which now have all been cancelled without prior notice and more importantly, with no regard to the materials and labour already in place for these orders, or

indeed any opportunity to follow up on any defects that may have been found in the USA warehouse.

17. These purchase orders were placed to the factory and SHOELOGICS by written signed official orders, and then cancelled without notice (by Mr. Kim) after the visit. During the visit this was never mentioned as a possibility, again it was done at a later stage outside of a normal business notice period being given.

18.     Despite the Plaintiffs having completed their jobs all at the Defendant's request and specifications, the Defendant wrongfully cancelled the contract, cancelled the order(s) and caused the Plaintiff to incur massive expense and suffer severe financial losses (the Debt). Development for the year 2020 has been ongoing for months; costs for labor, materials, moulds and sample shipping costs have been incurred and are now also-an outstanding cost. This development involved a lot of long hours and hard work by many people in Vietnam.

## COUNT I
## BREACH OF CONTRACT
Against All Defendants

19. Plaintiffs re-adopt and re-allege Counts 1-18 as though fully set forth herein.

20. On or about August 21, 2012 and then until approximately May, 2019, the Plaintiffs SHOELOGICS (for a time the HPC Factory) and then TAN AN, developed and manufactured the Defendant's shoes all based on the Defendant's

designs and specifications. The contract evidencing the agreement is Ex. "A" attached to this Complaint.

21. SHOELOGICS acted as the Defendant's agent from 2012 until May, 2019 (per the Contract). TAN AN started production for the Defendant mid-year 2018. From 2012 through 2019, SHOELOGICS directly developed the Defendant's products based on the Defendant's specifications, and the cost of development was covered by the income generated by the purchase orders made and delivered.

22. On or about May 1, 2019, Mr. Kim, the Defendant's Chief Executive Officer, flew to the TAN AN factory in Vietnam and decided to change the Defendant's current business plan (the "Meeting"). At the Meeting, Mr. Kim, an individual named Udi, Susie Minier, and SHOELOGICS' owner (Mr. Jason Kim) discussed the Defendant's business needs. Mr. Kim, on behalf of the Defendant, stated that the Defendant wanted new core product that would meet Free on Board (FOB) $18.00, to generate more sales for the Defendant and in addition generate more business opportunities for the associated companies that were helping to develop the new range or core products.

23. At this Meeting, Mr. Kim, while in Susie Minier's presence (Ms. Minier is the Defendant's vice president of its operations), assured the Plaintiffs' owners that they were pleased with the Plaintiffs' work and made the request for future orders – at all times herein, the Plaintiffs relied on the Defendant's assurances that the

Plaintiffs' performance was acceptable and that there would be future orders. But for the assurances made by Mr. Kim, the Plaintiffs would not have continued to perform.

24. After the Plaintiffs performed their contractual obligations, the Defendant, without justification, breached the Contract and ordered a total cessation of business.

25. Upon information and belief, the Defendant breached the contract because the Defendant's buyers purchased a lot of the Defendant's products (transactions which did not involve the Parties to this Case and had nothing to do with the Contract) which were made in error, and therefore the orders were cancelled. The Defendant, in turn, did not want to pay for more inventory and production (even though all of this was done at the Defendant's request) because it had purchased millions of dollars of inventory that it could not sell, which is likely the reason why the Defendant wanted greatly reduced retail prices. The Defendant concealed its business and finance problems of being overstocked from the Plaintiffs so that it could convince the Plaintiffs into performing. Upon information and belief, the Defendant requested a much lower price-point from the Plaintiffs so that it could quickly sell the inventory to make up for its losses which arose from its other business totally unrelated to the transactions in this Case.

26. At all times herein, the Plaintiffs performed their contractual obligations, and the Defendant's lack of performance has never been excused.

27. As a result of the aforesaid breaches, Plaintiff has incurred near $1.8 Million Dollars in losses proximately caused by the Defendant's unjustified breach of the Contract.

## COUNT II
## DETRIMENTAL RELIANCE
### (Against All Defendants)

28. Plaintiff incorporates by this reference each and all of the allegations contained in paragraphs 1 through 27 hereof, as if fully set forth herein.

29. As stated above, the Plaintiffs would have never performed and manufactured the Defendant's production orders but for the promises made by Mr. Kim on or about May 1, 2019, that the Defendant would order around 100,000 pairs of shoes covering at least 3 new core styles per season (6 months of orders) plus other styles to be also designed and developed for the season of 6 months.

30. Upon information and belief, Mr. Kim made the suggestion of volumes of orders over a specific length of time to lure the Plaintiffs to manufacture the Defendant's products on an expedited basis, causing the Plaintiffs to incur even more expense. Mr. Kim knew that the Defendant had recently come out of bankruptcy and that it would be difficult to find companies to work with due to the Defendant's poor business credit. Therefore, the Defendant, thru its officers, made

the suggestion of large orders so that the Plaintiffs would agree to work night and day to produce a product it could sell quickly to generate more cash.

31. The Plaintiffs could reasonably rely on the orders placed by the Defendant because the Defendant's chief executive officer was in the factory examining the orders, giving verbal assurances that the Plaintiffs' products would perform well at the Defendant's stores, and the Plaintiff had been working with the Defendant over the past six years.

32. As evidenced by the Contract, as well as the Plaintiff's right to cure any defects, the Defendant did not have a right to place an order, cancel without proper inspection, refuse the right to cure, and then not provide compensation. Indeed, the Plaintiffs relied on the assurances given by Mr. Kim that at all times herein, the Plaintiffs were performing to a satisfactory level.

33. On or about July 3, 2019, Plaintiffs, through their counsel of record, sent a detailed letter requesting that the Defendant repay the Debt (see Ex. "B" attached hereto and incorporated by reference).

34. The Defendant refuses to pay any of the Debt, despite repeated requests.

35. As a proximate cause of relying on the Defendant and its officers for the aforementioned promises during the Meeting, the Plaintiff has incurred more than $250,000.00 in costs which includes but is not limited to costs of samples produced

with Michael Craven (an employee of the Defendant), as well as production and labor costs.

## COUNT III
## UNFAIR BUSINESS PRACTICES – BUS. & PROF. CODE § 17200
### (Against All Defendants)

37. Plaintiff re-adopts and re-alleges Counts 1-36 as though fully set forth herein.

38. The Defendant, through its officer Mr. Kim, lured the Plaintiffs to produce a product and then once the companies completed its part of the bargain, the Defendant intentionally breached the contract to avoid payment.

39. The Defendant kept the spring, 2019 shipment, refuses to pay for it, and is likely trying to sell the product that the Plaintiffs shipped without paying anything towards reducing the Debt.

40. Due to the false assurances made by Mr. Kim at the Meeting that the Plaintiffs were doing good work, the Defendant caused the Plaintiffs to make the future product lines but then wrongfully refused to accept them (these products are in addition to the ones the Defendant has received but refuses to pay for them). The Defendant refused to permit the Plaintiffs the right to cure to avoid having to pay for the products it ordered. This is most certainly a deceptive business practice and the Plaintiffs will seek full restitution.

41. The Plaintiffs expect to prove that the Defendants intentionally misled the Plaintiffs to produce a less expensive product to try to increase fast sales to offset its current inventory that it cannot sell.

42. As a proximate result of the Defendant's deceptive business practice, the Plaintiffs will seek full restitution of all of its costs of production which is at least $250,000.00.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff, prays for judgment as follows:

PURSUANT TO COUNT I BREACH OF CONTRACT – AGAINST THE
WALKING COMPANY, INC.,
AND DOES 1 THROUGH 10, INCLUSIVE

1. That the Defendant pay $1.8 Million Dollars in expectation damages.

2. Defendant be required to pay actual damages increased to the maximum extent permitted by law and/or statutory damages at Plaintiffs' election;

3. Defendant be required to pay for attorneys' fees and costs.

4. For such other and further relief as is just and proper.

PURSUANT TO COUNT II DETRIMENTAL RELIANCE – AGAINST THE
WALKING COMPANY, INC.,
AND DOES 1 THROUGH 10, INCLUSIVE

1. Defendant, its officers, agents, servants, representatives, employees, attorneys, parents, subsidiaries, related companies, partners, successors, predecessors,

assigns, distributors, and all persons acting for, with, by, through or under them, and each of them, required to pay actual damages in amounts no less than $250,000.00.

2. Defendant be required to pay actual damages increased to the maximum extent permitted by law and/or statutory damages at Plaintiffs' election;

3. For such other and further relief as is just and proper.

<u>PURSUANT TO COUNT III BUS. & PROF. CODE § 17200– AGAINST THE
WALKING COMPANY, INC.,
AND DOES 1 THROUGH 10, INCLUSIVE</u>

1. Defendant, its officers, agents, servants, representatives, employees, attorneys, parents, subsidiaries, related companies, partners, successors, predecessors, assigns, distributors, and all persons acting for, with, by, through or under them, and each of them, required to pay actual damages in amounts no less than $250,000.00.

2. Defendant be required to pay restitution damages increased to the maximum extent permitted by law and/or statutory damages at Plaintiffs' election;

3. For such other and further relief as is just and proper.

**BALONICK LAW OFFICE, INC.**

DATED: August 14, 2019

By: _____

Barney Balonick, Esq.
10100 Santa Monica Blvd
Suite 1700
Los Angeles, CA 90067
310.703.1755

Attorneys for Plaintiff

EXHIBIT A



July 3, 2019

VIA E-MAIL AND CERTIFIED MAIL

Susie Minier (susiem@thewalkingcompany.com)
Senior VP of Operations
The Walking Company, Inc.
2475 Townsgate Road #200
Westlake Village, CA 91361

Re:    Shoelogics, Ltd., Tan An T&C Co., Ltd. (the "Plaintiff(s)), v. The Walking Company, Inc.
*(the "Defendant"); (the "Case")*

Dear Ms. Minier,

This firm is counsel for the Plaintiffs and has been retained to pursue any and all outstanding amounts owed from the Defendant, The Walking Company, Inc., As you know, the Defendant engaged the Plaintiffs (pursuant to the attached Sourcing Agreement (the "Agreement" and/or "Contract")) to develop footwear. Specifically, the Defendant engaged Shoelogics, Ltd., to develop and commercialize footwear lines, and also authorized Shoelogics, Ltd., to engage a factory (Tan An T&C Co., Ltd.), to manufacture and produce the company's products. Your company placed vast amounts of orders for these shoes to be produced at your company's specifications. Your company now refuses to pay despite our clients' repeated requests and as you can see from the enclosures, the Plaintiffs have incurred significant expense in relying to its detriment based on your orders for production.

In any event, as you can see from the enclosed bills, the Defendant's balance owed is *$1,718,223.92* (the "Debt"). The Debt includes the funds owed to Shoelogics, Ltd. ($235,063.04) and for the Tan An T&C Co., Ltd., engaged to produce the Defendant's product ($1,483.160.88). You will see from the enclosed spread sheets, Agreement and invoices prepared by the Plaintiffs support our clients' contentions evidencing the Debt. All costs incurred and profits lost were proximately caused by the Defendant's orders and abrupt and unjustified cancellation.

This firm has been retained to pursue the Defendant for the Debt. While this letter and the attachments explain the full amount of the Debt, we have taken the liberty to outline the various causes of action we intend to plead in court should this Debt not be paid. Under normal circumstances, a collection letter would be sent out only with evidence of an outstanding debt attached. In this case however, due to the large amount of the Debt and the egregious conduct by some of the Defendant's officers, we have taken the liberty and provided some of the Plaintiffs' anticipated causes of action to demonstrate that the Plaintiffs have every intention of pursuing their legal rights and remedies.

*Shoelogics, Ltd., Tan An T&C Co., Ltd. (the "Plaintiff(s)), v. The Walking Company, Inc. (the "Defendant"); (the "Case")*

The Plaintiffs are willing to avoid litigation so long as the Defendant pays the Debt in full by no later than August 10, 2019. If neither the Debt is paid in full nor a mutually satisfactory payment arrangement is accomplished by August 10, 2019, this firm will be authorized to pursue legal action against your company. In the event that the Defendant entity is under-capitalized, its various directors and officers may face issues of personal liability.

Plaintiff's Alleged Facts and Causes of Action

Starting around 2012, Shoelogics acted as the Defendant's agent and produced footwear product at the Defendant's request for years. Apparently, the Defendant filed for bankruptcy relief and avoided paying the Plaintiff almost $900,000.00 pursuant to its Chapter 11 bankruptcy. Subsequently, and starting around mid-2018, the factory (MH) developed and manufactured the product for the Defendant, all at the Defendant's request. The Defendant had direct control of monitoring the shoes as they were made and worked in close conjunction with Shoelogics, and at all times herein, the Defendant never objected to MH acting as the factory until it terminated the Contract.

Decisions that directly impacted the Defendant's products were always discussed between Defendant and Shoelogics. Shoelogics developed the Defendant's products based on the Defendant's designs, and Shoelogics was never responsible for any costs other than local costs as defined the agreement. The cost of development was covered by the income generated by the POs made and delivered.

Earlier this year, some of Defendant's officers went to the Plaintiff's factory, placed new orders and provided assurances that the Shoelogics team was doing a good job and never indicated that any past orders were non-conforming. As it turns out, the assurances during this visit were false and likely made to induce the Plaintiff to not only ship products but manufacture more. Indeed, these false assurances were used to lure the Plaintiffs into continuing to produce the shoes for the Defendant's company but at a lower price of $18.00. Apparently, the Defendant (through Mr. Kim's verbal assurances) placed its orders and maintained that so long as the Plaintiffs could produce shoes at this price, then the Plaintiffs were promised that there would be orders of 100,000 units per month – the Plaintiffs relied on these promises and therefore produced the shoes. The TanAn (MH) factory manufactured the product for the Defendant, all which now have all been cancelled without prior notice and more importantly, with no opportunity to cure any defects. These purchase orders were placed and then cancelled without notice (by Mr. Kim) after the visit. During the visit this was never mentioned as a possibility, again it was done at a later stage outside of a normal business notice period being given.

2 °

Regardless, the Defendant wrongfully cancelled the contract, cancelled the order(s) and caused the Plaintiff to incur massive expense and suffer severe financial losses (the "Debt"). Development for S2020 has been ongoing for months, costs for labor, materials, moulds and sample shipping costs have been incurred and are now also an outstanding cost. This development involved a lot of long hours and hard work by many people in Vietnam.

The Defendant (through its officers) stated the orders for the core styles could reach 100,000 pairs over 6 months if the design is correct, and the designs were worked on during the visit from Michael Craven, the Defendant's head designer. Mr. Jason Shim and his team worked with Michael Craven in the factory and very quickly produced samples as demanded. These were expedited urgently by working day and night from the 6th of May through the 12th of May, 2019, and the estimated cost for this work including overtime for the workers, materials etc., is approximately $30,000.00 to $50,000.00. The samples were made and shipped out to the attention of the Defendant and nothing was heard from them on this subject.

The Defendant arbitrarily and without justification cancelled all orders in transit and in production, and wrongfully and under false pretenses rejected all orders actually in the warehouse. As things stand today, all development charges for 2019 and 2020 products, retainers and commissions have not been paid.

At or near May, 2019, Defendant (through their officer, Mr. Kim) went to the factory and claimed that the recent visit was to sell their product at $29.99, no issues of quality were raised during this visit and in fact only praise was given. At this same meeting, Mr. Kim and Mr. Udi decided that they would change the Defendant's direction and instead develop new core product that will meet the target of FOB $18.00. This was done specifically to generate more sales for the Defendant and additionally, generate more business opportunities for the associated companies who were helping to develop this new range of core products.

### Causes of Action (actual and potential)

1.  Breach of Contract

To plead breach of contract in California, all that needs to be pleaded are the following:

To be entitled to damages for breach of contract, a plaintiff must plead and prove the following elements: (1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) resulting damage to the plaintiff. *Oasis West Realty, LLC v. Goldman*, 51 Cal.4th 811, 821, 124 Cal.Rptr.3d 256, 250 P.3d 1115 (2011); *Reichert v. General Ins. Co.*, 68 Cal.2d 822, 830, 69 Cal.Rptr. 321, 442 P.2d 377 (1968).

3 °

*Shoelogics, Ltd., Tan An T&C Co., Ltd. (the "Plaintiff(s)), v. The Walking Company, Inc. (the "Defendant"); (the "Case")*

Here, the contract is the Sourcing Agreement. It is obvious that the Plaintiffs performed, and the Defendant breached by refusing to pay. The damages the Plaintiffs sustained is approximately $1.8M and it is likely the first cause of action to be filed. Since this case is governed by the Uniform Commercial Code (as well as the Federal Rules of Civil Procedure), it also appears that the Defendant is in violation of Cal. Comm. Code § 2508, et seq. Even if the Defendant were to maintain that the product was non-conforming, the Defendant's performance was never excused. The Plaintiffs must be provided a right to cure any defects (the Plaintiff offered a non-related 3rd party to inspect but this too was rejected by the Defendant) and most importantly, the Defendant is not permitted to keep the product that was shipped without paying for it. Clearly, the Defendant will be paying for its breach of the Agreement.

Detrimental Reliance

After establishing actual reliance, the plaintiff must show that the reliance was reasonable by showing that (1) the matter was material in the sense that a reasonable person would find it important in determining how he or she would act, and (2) it was reasonable for the plaintiff to have relied on the misrepresentation." (*Hoffman v. 162 North Wolfe LLC* (2014) 228 Cal.App.4th 1178, 1194 [175 Cal.Rptr.3d 820], internal citations omitted.)

Here, the Plaintiff relied on Mr. Kim's assurances that the orders were going to be placed and paid for pursuant to the other orders. As evidenced by the Contract, as well as the Plaintiff's right to cure any defects, the Defendant did not have a right to place an order, cancel without proper inspection, refuse the right to cure, and then not provide compensation. Indeed, the Plaintiffs relied on the assurances given by Mr. Kim that at all times herein, the Plaintiffs were performing well. Had Mr. Kim not placed the orders and assured the Plaintiffs that they were doing a good job, the Plaintiffs would not have incurred the massive expense reflected in the attached spread sheets.

Unfair/Deceptive Business Practice – Bus. & Prof. Code § 17200, et. seq.

Section 17200 defines unfair competition as "any unlawful, unfair or fraudulent business act or practice...." The "unlawful" practices prohibited by section 17200 are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made. As our Supreme Court put it, section 17200 "borrows" violations of other laws and treats them as unlawful practices independently actionable under section 17200, et seq. (*Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 383, 6 Cal.Rptr.2d 487, 826 P.2d 730.) "Unfair" simply means any practice whose harm to the victim outweighs its benefits. (*Motors, Inc. v. Times Mirror Co.* (1980) 102 Cal.App.3d 735, 740,

162 Cal.Rptr. 543.) "Fraudulent," as used in the statute, does not refer to the common law tort of fraud but only requires a showing members of the public " 'are likely to be deceived.' " (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1267, 10 Cal.Rptr.2d 538, 833 P.2d 545.)

Here, after reviewing the evidence the Defendant, thru Mr. Kim, lured the Plaintiff's companies to produce a product and then once the companies completed its part of the bargain, the Defendant intentionally breached the contract to avoid payment. To add to this cause of action, the Plaintiff will plead that the Defendant kept the spring 2019 shipment, refused to pay for it (and likely is selling the product), and due to false assurances made by Mr. Kim that the Plaintiffs were doing good work, caused the Plaintiffs to make the future product lines but then wrongfully refused to accept them. The Defendant refused to permit the Plaintiffs the right to cure to avoid having to pay for the products it ordered. This is most certainly a deceptive business practice and the Plaintiffs will seek full restitution.

<u>Fraudulent Inducement</u>

The action is one of deceit, which requires proof that the defendant made a misrepresentation of fact or a promise without any intention of performing it. (Civ. Code, § 1710.) A complaint for fraud must allege the following elements: (1) a knowingly false representation by the defendant; (2) an intent to deceive or induce reliance; (3) justifiable reliance by the plaintiff; and (4) resulting damages. (*Croeni v. Goldstein* (1994) 21 Cal.App.4th 754, 758, 26 Cal.Rptr.2d 412.) Every element must be specifically pleaded. (*Tarmann v. State Farm Mut. Auto. Ins. Co.* (1991) 2 Cal.App.4th 153, 157, 2 Cal.Rptr.2d 861.)

Here, the false promises of the orders by Mr. Kim were obviously false and he knew that they were false when he made them. Based on what has been submitted in e-mails and "we-chat" messages, it looks like the Defendant (and Mr. Kim) deceived the Plaintiffs to making the product and falsely promised large orders. Once the Defendant received the shoes, it decided to not pay for what it received and further refuses to pay for the product that has yet to be shipped. Without question, the Plaintiffs would have never incurred the expense of development and production but for Mr. Kim's assurances that the Plaintiffs were performing properly and orders for future lines.

This letter is sent partly as a courtesy to give You an opportunity to pay the Debt without the additional embarrassment and expense of litigation. Please note carefully that this is not the first in a series of collection efforts; no other notice or demand will be given. The law gives you 30 days after you receive this letter to dispute the validity of the Debt or any part of it. If you do not dispute it within that 30-day period, this firm will assume the Debt is valid. If You do dispute it by timely notifying this firm in writing to that effect, then as required by law, you will be mailed other written verification of the Debt.

5 °

*Shoelogics, Ltd., Tan An T&C Co., Ltd. (the "Plaintiff(s)), v. The Walking Company, Inc. (the "Defendant"); (the "Case")*

Please be aware that this firm engages in collection of debts and is attempting to collect a debt – any information obtained will be used for that purpose. This firm has been retained by Shoelogics, Ltd., and Tan An T&C Co., Ltd., to collect the entire Debt from the Defendant. Therefore, please pay it forthwith. In the event that the Defendant has counsel, please have those attorneys contact this office forthwith.

Nothing in this letter constitutes a waiver or relinquishment of any of the Plaintiffs' rights, remedies or claims. All of those are expressly reserved.

Very truly yours,

Barney Balonick, Esq.

6

Cost Summary of Shoelogics

|   | Items | Total cost U$ |
|---|---|---|
| A | Commision Payments | 62,178.39 |
| B | Retainer, April and May | 10,000.00 |
| C | Development cost Spring'20 and core style development | 99,491.93 |
| D | Spring'20 sample moulds cost | 4,900.00 |
| E | Cost of closing SL | 59,492.72 |
|   | Total | 236,063.04 |

Remarks

## TAN AN TOURIST & COMMERCIAL CO.,LTD
NO 22 HONG BANG RD, SO DAU TOWN, HONG BANG DISTRICT, HAI PHONG CITY, VIETNAM

| PO NO | Style NO | color | q.ty (PRS) | Material U/P | Material Amount | LO U/P | LO Amount | Profit U/P | Profit Amount | FOB U/P | FOB Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 181921 | VJM1117 | TAUPE | 1800 | $22.90 | $41,220.00 | $9.55 | $17,190.00 | $2.60 | $4,680.00 | $35.05 | $63,090.00 |
| 181979/181981 | VSM1143 | NAVY/LIME | 1464 | $17.95 | $26,278.80 | $6.40 | $9,369.60 | $1.95 | $2,854.80 | $26.30 | $38,503.20 |
| 181979/181981 | VSM1143 | DK GREY/BRICK | 2424 | $17.95 | $43,510.80 | $6.40 | $15,513.60 | $1.95 | $4,726.80 | $26.30 | $63,751.20 |
| 181932/181946 | VDW1142 | DK PLUM/PUR | 1416 | $15.41 | $21,820.56 | $5.90 | $8,354.40 | $1.71 | $2,421.36 | $23.02 | $32,596.32 |
| 181932/181933/181946 | VDW1142 | BLK/BLU | 3864 | $14.96 | $57,805.44 | $5.90 | $22,797.60 | $1.67 | $6,452.88 | $22.53 | $87,055.92 |
| 181932/181933/181946 | VDW1142 | DK GREY/SKY | 3000 | $15.41 | $46,230.00 | $5.90 | $17,700.00 | $1.71 | $5,130.00 | $23.02 | $69,060.00 |
| 181932 | VDW1142 | LT GRY/ROSE | 1308 | $15.41 | $20,156.28 | $5.90 | $7,717.20 | $1.71 | $2,236.68 | $23.02 | $30,110.16 |
| 181982/181983 | VSW1143 | DK GRY/PUR | 3744 | $16.51 | $61,813.44 | $6.40 | $23,961.60 | $1.83 | $6,851.52 | $24.74 | $92,626.56 |
| 181982 | VSW1143 | BLUE/LIME | 2328 | $16.96 | $39,482.88 | $6.40 | $14,899.20 | $1.87 | $4,353.36 | $25.23 | $58,735.44 |
| 182095 | VDM1147 | TAUPE | 1476 | $19.32 | $28,516.32 | $5.90 | $8,708.40 | $2.02 | $2,981.52 | $27.24 | $40,206.24 |
| 182104/182096 | VDM1149 | BLACK | 1452 | $21.69 | $31,493.88 | $5.90 | $8,566.80 | $2.20 | $3,194.40 | $29.79 | $43,255.08 |
| 182096 | VDM1149 | CHOCOLATE | 2220 | $21.35 | $47,397.00 | $5.90 | $13,098.00 | $2.18 | $4,839.60 | $29.43 | $65,334.60 |
| 182175/182181 | VDM1113 | COFFEE | 1188 | $20.85 | $24,769.80 | $5.90 | $7,009.20 | $2.14 | $2,542.32 | $28.89 | $34,321.32 |
| 182175/182181 | VDM1113 | BLACK SMOOTH | 1152 | $21.25 | $24,480.00 | $5.90 | $6,796.80 | $2.17 | $2,499.84 | $29.32 | $33,776.64 |
| 183042 | VJM1117 | BROWN | 2532 | $22.92 | $58,033.44 | $9.55 | $24,180.60 | $2.60 | $6,583.20 | $35.07 | $88,797.24 |
| 183042 | VJM1117 | BLACK | 840 | $23.25 | $19,530.00 | $9.55 | $8,022.00 | $2.63 | $2,209.20 | $35.43 | $29,761.20 |
| 183072/183073 | PAW1078 | GREY | 816 | $24.76 | $20,204.16 | $9.55 | $7,792.80 | $2.75 | $2,244.00 | $37.06 | $30,240.96 |
| 183072/183073 | PAW1078 | BLACK | 1608 | $24.76 | $39,814.08 | $9.55 | $15,356.40 | $2.75 | $4,422.00 | $37.06 | $59,592.48 |
| 181980 | VSM1144 | BLACK | 2508 | $18.25 | $45,771.00 | $6.40 | $16,051.20 | $1.97 | $4,940.76 | $26.62 | $66,762.96 |
| 181980 | VSM1144 | FROST/ORANGE | 1260 | $18.52 | $23,335.20 | $6.40 | $8,064.00 | $1.99 | $2,507.40 | $26.91 | $33,906.60 |
| 182188/182190 | VDW1146 | FROST/LIME | 1590 | $13.64 | $21,687.60 | $5.90 | $9,381.00 | $1.57 | $2,496.30 | $21.11 | $33,564.90 |
| 182188/182189/182190 | VDW1146 | BLK | 2922 | $13.64 | $39,856.08 | $5.90 | $17,239.80 | $1.57 | $4,587.54 | $21.11 | $61,683.42 |
| 182188 | VDW1146 | WHTE/LT GREY | 1188 | $13.15 | $15,622.20 | $5.90 | $7,009.20 | $1.52 | $1,805.76 | $20.57 | $24,437.16 |
| 182097 | VDM1127 | NAVY/BLUE | 1044 | $19.71 | $20,577.24 | $5.90 | $6,159.60 | $2.05 | $2,140.20 | $27.66 | $28,877.04 |
| 182670/182671 | VSW1144 | BLACK | 3780 | $17.31 | $65,431.80 | $6.40 | $24,192.00 | $1.90 | $7,182.00 | $25.61 | $96,805.80 |
| 182670/182671 | VSW1144 | CHAR/PNK | 2220 | $17.61 | $39,094.20 | $6.40 | $14,208.00 | $1.92 | $4,262.40 | $25.93 | $57,564.60 |
| 182670 | VSW1144 | FROST/AQUA | 1200 | $18.06 | $21,672.00 | $6.40 | $7,680.00 | $1.96 | $2,352.00 | $26.42 | $31,704.00 |
| 182670 | VSW1144 | DUSTY MAUVE | 1200 | $17.61 | $21,132.00 | $6.40 | $7,680.00 | $1.92 | $2,304.00 | $25.93 | $31,116.00 |
| 183090/183091 | PAW1026 | GREY | 600 | $15.33 | $9,198.00 | $6.20 | $3,720.00 | $1.72 | $1,032.00 | $23.25 | $13,950.00 |
| 183090/183091 | PAW1026 | BLACK | 1404 | $12.28 | $17,241.12 | $6.20 | $8,704.80 | $1.48 | $2,077.92 | $19.96 | $28,023.84 |
| 183090/183091 | PAW1026 | NAVY BLUE | 600 | $15.33 | $9,198.00 | $6.20 | $3,720.00 | $1.72 | $1,032.00 | $23.25 | $13,950.00 |
| | | | | S-ttl | $1,002,373.32 | S-ttl | $370,843.80 | S-ttl | $109,943.76 | G-total | $1,483,160.88 |

**Shoe-Logics Korea**

Room 1302, Building C, Wonderful Ocean Life W
Bunpo road 145, Yongho Dong, Namgu, Busan, Korea.

**Invoice to:**
The Walking Company
2475, Townsgate Road,
Suite #200, Westlake Village,
CA91361, CA
U.S.A.

| Description | Q'ty |
|---|---|
| Q.C and Inspection carried out in Vietnam<br>24,840pairs under PO180190,91,93,62,63,66,71,89,181199, and 181483<br>5% commission of total amount U$651,771.84<br>180190, LEW1134, 4,176pairs<br>180191, LEW1134, 576pairs<br>180193, LEW1134, 48pairs<br>180162, VDW1138, 6,036pairs<br>180163, VDW1138, 864pairs<br>180166, VSM1135, 4,620pairs<br>180171, VDW1138, 24pairs<br>180189, LEW1154, 3,456pairs<br>181199, LEW1155, 2,508pairs<br>181483, VDM1127, 2,532pairs<br><br>Factory : MH<br>Cormercial Invoice :MH-ABEO190119-1,2,3, and 4<br>Sailing on/about : Jan 19<br>Arriving on : Mar 10 | |

**Bank Details:**
Bank : Kook min Bank
Address : Kook Min Bank Centum Branch, Room 116, Dae Woo World Mark,
Centum dong Road 25, Hae Un Dae, Busan, Korea
A/C# : 564768-11-003611
Name : Shim, Jae Hak (Shoe-Logics Ko), Kim, Hyun Ji +82 10 8801 8786
SWIFT code : CZNBKRSE

## INVOICE

| Date | Invoice No. |
|---|---|
| 2-May-19 | SLC-0502-19-1 |

| Price | Amount | Remarks |
|---|---|---|
| 651,771.84 | 32,588.59 | |

| Total: | 32,588.59 | |
|---|---|---|

**Shoe-Logics Korea**

Room 1302, Building C, Wonderful Ocean Life W
Bunpo road 145, Yongho Dong, Namgu, Busan, Korea.

**Invoice to:**
The Walking Company
2475, Townsgate Road,
Suite #200, Westlake Village,
CA91361, CA
U.S.A.

| Description | Q'ty |
|---|---|
| Q.C and Inspection carried out in Vietnam | |
| 5,988pairs under PO180175, 76, 81, and 82 | |
| 5% commission of total amount U$168,095.02 | |
| 18075, VSW1137, 3,179pairs | |
| 180181, VSW1137, 288pairs | |
| 180176, VSW1135, 1,824pairs | |
| 180182, VSW1135, 576pairs | |
| Factory : MH | |
| Cormercial Invoice :MH-ABEO190128 | |
| Sailing on/about : Jan 28 | |
| Arriving on : Mar 20 | |

**Bank Details:**
Bank : Kook min Bank
Address : Kook Min Bank Centum Branch, Room 116, Dae Woo World Mark,
Centum dong Road 25, Hae Un Dae, Busan, Korea
A/C# : 564768-11-003611
Name : Shim, Jae Hak (Shoe-Logics Ko), Kim, Hyun Ji +82 10 8801 8786
SWIFT code : CZNBKRSE

## INVOICE

| Date | Invoice No. |
|---|---|
| 2-May-19 | SLC-0502-19-2 |

| Price | Amount | Remarks |
|---|---|---|
| 168,095.02 | 8,404.75 | |

| Total: | 8,404.75 | |
|---|---|---|

**Shoe-Logics Korea**

Room 1302, Building C, Wonderful Ocean Life W
Bunpo road 145, Yongho Dong, Namgu, Busan, Korea.

**Invoice to:**
The Walking Company
2475, Townsgate Road,
Suite #200, Westlake Village,
CA91361, CA
U.S.A.

| Description | Q'ty |
|---|---|
| Q.C and Inspection carried out in Vietnam | |
| 348pairs under following Pos | |
| 5% commission of total amount U$6,562.80 | |
| 180170, VDW1138, 84pairs | |
| 180185, VDW1137, 144pair | |
| 180184, VSW1135, 60pair | |
| 180167, VSM1135, 60 pairs | |
| | |
| Factory : MH | |
| Cormercial Invoice :KOR1184-19 | |
| Sailing on/about : Feb 29 2019 | |
| Arriving on : Mar 04 2019 | |

**Bank Details:**
Bank : Kook min Bank
Address : Kook Min Bank Centum Branch, Room 116, Dae Woo World Mark,
Centum dong Road 25, Hae Un Dae, Busan, Korea
A/C# : 564768-11-003611
Name : Shim, Jae Hak (Shoe-Logics Ko), Kim, Hyun Ji +82 10 8801 8786
SWIFT code : CZNBKRSE

**Shoe-Logics Korea**

Room 1302, Building C, Wonderful Ocean Life W
Bunpo road 145, Yongho Dong, Namgu, Busan, Korea.

Invoice to:
The Walking Company
2475, Townsgate Road,
Suite #200, Westlake Village,
CA91361, CA
U.S.A.

| Description | Q'ty |
|---|---|
| Q.C and Inspection carried out in Vietnam | |
| 216pairs under following Pos | |
| 5% commission of total amount U$5,580.36 | |
| 180192, LEW1134, 120 pairs | |
| 180172,VDW1138, 84pairs | |
| 180184, VDM1127, 12pairs | |
| | |
| Factory : MH | |
| Cormercial Invoice :JPN1182 | |
| Sailing on/about :  Apr 04 2019 | |
| Arriving on : Apr 05 2019 | |

Bank Details:
Bank : Kook min Bank
Address : Kook Min Bank Centum Branch, Room 116, Dae Woo World Mark,
Centum dong Road 25, Hae Un Dae, Busan, Korea
A/C# : 564768-11-003611
Name : Shim, Jae Hak (Shoe-Logics Ko), Kim, Hyun Ji +82 10 8801 8786
SWIFT code : CZNBKRSE

## INVOICE

| Date | Invoice No. |
|---|---|
| 30-May-19 | SLC-0503-19-4 |

| Price | Amount | Remarks |
|---|---|---|
| 5,580.36 | 279.02 | |

| Total: | 279.02 |
|---|---|

**Shoe-Logics Korea**

Room 1302, Building C, Wonderful Ocean Life W
Bunpo road 145, Yongho Dong, Namgu, Busan, Korea.

**Invoice to:**
The Walking Company
2475, Townsgate Road,
Suite #200, Westlake Village,
CA91361, CA
U.S.A.

| Description | Q'ty |
|---|---|
| Q.C and Inspection carried out in Vietnam<br>2,556pairs under following Pos<br>5% commission of total amount U$75,197.52<br>180168, VSM1135, 2,556pairs<br><br>Factory : MH<br>Cormercial Invoice :MH-ABEO190311-1<br>Sailing on/about : Mar 11 2019<br>Arriving on : Apr 11 2019 | |

**Bank Details:**
Bank : Kook min Bank
Address : Kook Min Bank Centum Branch, Room 116, Dae Woo World Mark,
Centum dong Road 25, Hae Un Dae, Busan, Korea
A/C# : 564768-11-003611
Name : Shim, Jae Hak (Shoe-Logics Ko), Kim, Hyun Ji +82 10 8801 8786
SWIFT code : CZNBKRSE

# INVOICE

| Date | Invoice No. |
|------|-------------|
| 30-May-19 | SLC-0503-19-5 |

| Price | Amount | Remarks |
|-------|--------|---------|
| 75,197.52 | 3,759.88 | |

| Total: | 3,759.88 | |
|--------|----------|--|

**Shoe-Logics Korea**

Room 1302, Building C, Wonderful Ocean Life W
Bunpo road 145, Yongho Dong, Namgu, Busan, Korea.

Invoice to:
The Walking Company
2475, Townsgate Road,
Suite #200, Westlake Village,
CA91361, CA
U.S.A.

| Description | Q'ty |
|---|---|
| Q.C and Inspection carried out in Vietnam | |
| 13,079pairs under following Pos | |
| 5% commission of total amount U$306,368.90 | |
| 180177, VSW1137, 1,584 pairs | |
| 180178, VSW1135, 1,775pairs | |
| 180183, VSW1137, 576pairs | |
| 180160, VDW1125, 2,940pairs | |
| 180161, VDW1125, 576pairs | |
| 181698, LAW1166, 4,476pairs | |
| 181699, LAW1166, 1,152pairs | |
| | |
| Factory : MH | |
| Cormercial Invoice :MH-ABEO190320-1 and 2 | |
| Sailing on/about : Mar 20 | |
| Arriving on : April 24 | |

Bank Details:
Bank : Kook min Bank
Address : Kook Min Bank Centum Branch, Room 116, Dae Woo World Mark,
Centum dong Road 25, Hae Un Dae, Busan, Korea
A/C# : 564768-11-003611
Name : Shim, Jae Hak (Shoe-Logics Ko), Kim, Hyun Ji +82 10 8801 8786
SWIFT code : CZNBKRSE

# INVOICE

| Date | Invoice No. |
|------|-------------|
| 30-May-19 | SLC-0503-19-6 |

| Price | Amount | Remarks |
|-------|--------|---------|
| 306,368.90 | 15,318.45 | |

| Total: | 15,318.45 | |

**Shoe-Logics Korea**

Room 1302, Building C, Wonderful Ocean Life W
Bunpo road 145, Yongho Dong, Namgu, Busan, Korea.

**Invoice to:**
The Walking Company
2475, Townsgate Road,
Suite #200, Westlake Village,
CA91361, CA
U.S.A.

| Description | Q'ty |
|---|---|
| Q.C and Inspection carried out in Vietnam<br>198pairs under following Pos<br>5% commission of total amount U$5,670.12<br>180169, VSM1135, 84pairs<br>180186, VSW1135, 114pairs<br><br><br>Factory : MH<br>Cormercial Invoice :MH-ABEO190320-1 and 2<br>Sailing on/about : April 04<br>Arriving on : Apr 11 | |

**Bank Details:**
Bank : Kook min Bank
Address : Kook Min Bank Centum Branch, Room 116, Dae Woo World Mark,
Centum dong Road 25, Hae Un Dae, Busan, Korea
A/C# : 564768-11-003611
Name : Shim, Jae Hak (Shoe-Logics Ko), Kim, Hyun Ji +82 10 8801 8786
SWIFT code : CZNBKRSE

## INVOICE

| Date | Invoice No. |
|---|---|
| 30-May-19 | SLC-0503-19-8 |

| Price | Amount | Remarks |
|---|---|---|
| 5,670.12 | 283.51 | |

| | | |
|---|---|---|
| Total: | 283.51 | |

**Shoe-Logics Korea**

Room 1302, Building C, Wonderful Ocean Life W
Bunpo road 145, Yongho Dong, Namgu, Busan, Korea.

Invoice to:
The Walking Company
2475, Townsgate Road,
Suite #200, Westlake Village,
CA91361, CA
U.S.A.

| Description | Q'ty |
|---|---|
| Q.C and Inspection carried out in Vietnam | |
| 198pairs under following Pos | |
| 5% commission of total amount U$5,670.12 | |
| 180169, VSM1135, 84pairs | |
| 180186, VSW1135, 114pairs | |
| | |
| Factory : MH | |
| Cormercial Invoice :MH-ABEO190320-1 and 2 | |
| Sailing on/about : April 04 | |
| Arriving on : Apr 11 | |

Bank Details:
Bank : Kook min Bank
Address : Kook Min Bank Centum Branch, Room 116, Dae Woo World Mark,
Centum dong Road 25, Hae Un Dae, Busan, Korea
A/C# : 564768-11-003611
Name : Shim, Jae Hak (Shoe-Logics Ko), Kim, Hyun Ji +82 10 8801 8786
SWIFT code : CZNBKRSE

**Shoe-Logics Korea**

Room 1302, Building C, Wonderful Ocean Life W
Bunpo road 145, Yongho Dong, Namgu, Busan, Korea.

# INVOICE

| Date |
|---|
| May 02 19 |

**Invoice to:**
The Walking Company
2475, Townsgate Road,
Suite #200, Westlake Village,
CA91361, CA
U.S.A.

| Description | Price | Amount |
|---|---|---|
| Monthly base retainer for (15 April - 14 May) Sports shoes category | 5,000 | 5,000 |
| | **Total:** | US$5,000.00 |

**Bank Details:**
Bank : Kook min Bank
Address : Kook Min Bank Centum Branch, Room 116, Dae Woo World Mark,
Centum dong Road 25, Hae Un Dae, Busan, Korea
A/C# : 564768-11-003611
Name : Shim, Jae Hak (Shoe-Logics Ko), Kim, Hyun Ji +82 10 8801 8786
SWIFT code : CZNBKRSE

| Invoice No. |
| --- |
| April-R-19 |

| Remarks |
| --- |
| |

**Shoe-Logics Korea**

# INVOICE

| Date |
|------|
| May 27 19 |

Room 1302, Building C, Wonderful Ocean Life W
Bunpo road 145, Yongho Dong, Namgu, Busan, Korea.

**Invoice to:**
The Walking Company
2475, Townsgate Road,
Suite #200, Westlake Village,
CA91361, CA
U.S.A.

| Description | Price | Amount |
|---|---|---|
| Monthly base retainer for (15 May - 14 June) Sports shoes category | 5,000 | 5,000 |
| **Total:** | | **US$5,000.00** |

**Bank Details:**
Bank : Kook min Bank
Address : Kook Min Bank Centum Branch, Room 116, Dae Woo World Mark,
Centum dong Road 25, Hae Un Dae, Busan, Korea
A/C# : 564768-11-003611
Name : Shim, Jae Hak (Shoe-Logics Ko), Kim, Hyun Ji +82 10 8801 8786
SWIFT code : CZNBKRSE

| Invoice No. |
| --- |
| May-R-19 |

| Remarks |
| --- |
| |

**Shoe-Logics Korea**

# INVOICE

| Date |
|---|
| May 02 19 |

Room 1302, Building C, Wonderful Ocean Life W
Bunpo road 145, Yongho Dong, Namgu, Busan, Korea.

**Invoice to:**
The Walking Company
2475, Townsgate Road,
Suite #200, Westlake Village,
CA91361, CA
U.S.A.

| Description | Price | Amount |
|---|---|---|
| Monthly base retainer for  (15 April - 14 May) Sports shoes category | 5,000 | 5,000 |
| Total: | | US$5,000.00 |

**Bank Details:**
Bank : Kook min Bank
Address : Kook Min Bank Centum Branch, Room 116, Dae Woo World Mark,
Centum dong Road 25, Hae Un Dae, Busan, Korea
A/C# : 564768-11-003611
Name : Shim, Jae Hak (Shoe-Logics Ko), Kim, Hyun Ji +82 10 8801 8786
SWIFT code : CZNBKRSE

| Invoice No. |
| --- |
| April-R-19 |

| Remarks |
| --- |
| |

**Shoe-Logics Korea**

# INVOICE

| Date |
|---|
| May 27 19 |

Room 1302, Building C, Wonderful Ocean Life W
Bunpo road 145, Yongho Dong, Namgu, Busan, Korea.

**Invoice to:**
The Walking Company
2475, Townsgate Road,
Suite #200, Westlake Village,
CA91361, CA
U.S.A.

| Description | Price | Amount |
|---|---|---|
| Monthly base retainer for  (15 May - 14 June) Sports shoes category | 5,000 | 5,000 |
| | | |
| **Total:** | | **US$5,000.00** |

**Bank Details:**
Bank : Kook min Bank
Address : Kook Min Bank Centum Branch, Room 116, Dae Woo World Mark,
Centum dong Road 25, Hae Un Dae, Busan, Korea
A/C# : 564768-11-003611
Name : Shim, Jae Hak (Shoe-Logics Ko), Kim, Hyun Ji +82 10 8801 8786
SWIFT code : CZNBKRSE

| Invoice No. |
| --- |
| May-R-19 |

| Remarks |
| --- |

**Shoe-Logics Korea**

# INVOICE

| Date |
|------|
| 26-Jun-19 |

Room 1302, Building C, Wonderful Ocean Life W
Bunpo road 145, Yongho Dong, Namgu, Busan, Korea.

**Invoice to:**
The Walking Company
2475, Townsgate Road,
Suite #200, Westlake Village,
CA91361, CA
U.S.A.

| Description | Price | Amount |
|-------------|-------|--------|
| Mould developments Spring 20 | 4,900 | 4,900 |
| One set of LFM U$2,350 | | |
| One set of LFW U$2,550 | | |
| **Total:** | | **US$4,900.00** |

**Bank Details:**
Bank : Kook min Bank
Address : Kook Min Bank Centum Branch, Room 116, Dae Woo World Mark,
Centum dong Road 25, Hae Un Dae, Busan, Korea
A/C# : 564768-11-003611
Name : Shim, Jae Hak (Shoe-Logics Ko), Kim, Hyun Ji +82 10 8801 8786
SWIFT code : CZNBKRSE

| Invoice No. |
| --- |
| June-01-19 |

| Remarks |
| --- |
|  |

**Shoe-Logics Korea**

Room 1302, Building C, Wonderful Ocean Life W
Bunpo road 145, Yongho Dong, Namgu, Busan, Korea.

**Invoice to:**
The Walking Company
2475, Townsgate Road,
Suite #200, Westlake Village,
CA91361, CA
U.S.A.

| Description | Q'ty |
|---|---|
| Spring 20 and core style Development cost<br>Period from 1st Jan through 31st May | |

**Bank Details:**
Bank : Kook min Bank
Address : Kook Min Bank Centum Branch, Room 116, Dae Woo World Mark,
Centum dong Road 25, Hae Un Dae, Busan, Korea
A/C# : 564768-11-003611
Name : Shim, Jae Hak (Shoe-Logics Ko), Kim, Hyun Ji +82 10 8801 8786
SWIFT code : CZNBKRSE

## INVOICE

| Date | Invoice No. |
|---|---|
| 26-Jun-19 | June-02-19 |

| Price | Amount | Remarks |
|---|---|---|
| 99,491.93 | 99,491.93 | |

| Total: | 99,491.93 |
|---|---|

**Shoe-Logics Korea**

Room 1302, Building C, Wonderful Ocean Life W
Bunpo road 145, Yongho Dong, Namgu, Busan, Korea.

**Invoice to:**
The Walking Company
2475, Townsgate Road,
Suite #200, Westlake Village,
CA91361, CA
U.S.A.

| Description | Q'ty |
|---|---|
| Spring 20 and core style Development cost Period from 1st Jan through 31st May | |

**Bank Details:**
Bank : Kook min Bank
Address : Kook Min Bank Centum Branch, Room 116, Dae Woo World Mark,
Centum dong Road 25, Hae Un Dae, Busan, Korea
A/C# : 564768-11-003611
Name : Shim, Jae Hak (Shoe-Logics Ko), Kim, Hyun Ji +82 10 8801 8786
SWIFT code : CZNBKRSE

# INVOICE

| Date | Invoice No. |
|---|---|
| 26-Jun-19 | June-02-19 |

| Price | Amount | Remarks |
|---|---|---|
| 99,491.93 | 99,491.93 | |

| Total: | 99,491.93 |
|---|---|

**Shoe-Logics Korea**

Room 1302, Building C, Wonderful Ocean Life W
Bunpo road 145, Yongho Dong, Namgu, Busan, Korea.

**Invoice to:**
The Walking Company
2475, Townsgate Road,
Suite #200, Westlake Village,
CA91361, CA
U.S.A.

| Description | Q'ty |
|---|---|
| Spring 20 and core style Development cost<br>Period from 1st Jan through 31st May | |

**Bank Details:**
Bank : Kook min Bank
Address : Kook Min Bank Centum Branch, Room 116, Dae Woo World Mark,
Centum dong Road 25, Hae Un Dae, Busan, Korea
A/C# : 564768-11-003611
Name : Shim, Jae Hak (Shoe-Logics Ko), Kim, Hyun Ji +82 10 8801 8786
SWIFT code : CZNBKRSE

## INVOICE

| Date | Invoice No. |
|------|-------------|
| 26-Jun-19 | June-02-19 |

| Price | Amount | Remarks |
|-------|--------|---------|
| 99,491.93 | 99,491.93 | |

| Total: | 99,491.93 | |
|--------|-----------|---|

Development Costs Sp

| Spring 20 expenses | | |
|---|---|---|
| Period | Materials(U$) | Salary(U$) |
| Jan 19 | US$576.21 | US$12,400.00 |
| Feb 19 | US$654.55 | US$12,400.00 |
| Mar 19 | US$4,737.07 | US$12,400.00 |
| Apr 19 | US$1,370.41 | US$12,400.00 |
| May 19 | US$1,687.48 | US$10,953.00 |
| S.Total | US$9,025.72 | US$60,553.00 |

| Core Style Development expenses | | |
|---|---|---|
| Period | Materials | Over Time working (1) |
| May 19 | US$276.21 | US$1,447.00 |
| S.Total | US$276.21 | US$1,447.00 |

Note
1. Over time working - Money paid for working late

ring 20 and core styles

| Sample room, Including untilities | Accormodation | Visa | Travel |
|---|---|---|---|
| US$1,000.00 | US$1,000.00 | US$14,000.00 | US$1,200.00 |
| US$1,000.00 | US$1,000.00 | US$0.00 | US$250.00 |
| US$1,000.00 | US$1,000.00 | US$0.00 | US$220.00 |
| US$1,000.00 | US$1,000.00 | US$0.00 | US$220.00 |
| US$766.00 | US$766.00 | US$0.00 | US$450.00 |
| US$4,766.00 | US$4,766.00 | US$14,000.00 | US$2,340.00 |

| Soles and materials | Accormodation | meals | Travel |
|---|---|---|---|
| US$234.00 | US$234.00 | US$500.00 | US$500.00 |
| US$234.00 | US$234.00 | US$500.00 | US$500.00 |

nights

| Utilities | Monthly TTL |
|---|---|
| US$150.00 | US$30,326.21 |
| US$150.00 | US$15,454.55 |
| US$150.00 | US$19,507.07 |
| US$150.00 | US$16,140.41 |
| US$250.00 | US$14,872.48 |
| US$850.00 | US$96,300.72 |

| Core Total |
|---|
| US$3,191.21 |
| US$3,191.21 |

**Shoe-Logics Korea**

Room 1302, Building C, Wonderful Ocean Life W
Bunpo road 145, Yongho Dong, Namgu, Busan, Korea.

**Invoice to:**
The Walking Company
2475, Townsgate Road,
Suite #200, Westlake Village,
CA91361, CA
U.S.A.

| Description | Q'ty |
|---|---|
| Closing cost of Shoe logics | |

**Bank Details:**
Bank : Kook min Bank
Address : Kook Min Bank Centum Branch, Room 116, Dae Woo World Mark,
Centum dong Road 25, Hae Un Dae, Busan, Korea
A/C# : 564768-11-003611
Name : Shim, Jae Hak (Shoe-Logics Ko), Kim, Hyun Ji +82 10 8801 8786
SWIFT code : CZNBKRSE

## INVOICE

| Date | Invoice No. |
|---|---|
| 26-Jun-19 | June-03-19 |

| Price | Amount | Remarks |
|---|---|---|
| 59,492.72 | 59,492.72 | |

| Total: | 59,492.72 |
|---|---|

**Vendor-Item Stock & Sales Recap 6/8/2019**  Run Date: 6/10/2019

| Class | Vend | Style | Color | Desc | Ven/Sty | Last Recpt* | Cost* | Retail* |
|---|---|---|---|---|---|---|---|---|
| 3085 | 1168 | 18001 | 14 | TAYLOR - FLAT CHAMPAGNE N | ATO18N CHAMP | | 22.92 | 39.97 |
| 3085 | 1168 | 18011 | 45 | TAYLOR - FLT ANTHRACITE M | ATO18N ANTHRA | | 22.61 | 39.97 |
| 3085 | 1168 | 5000 | 16 | TAHIRA - FLAT TAUPE N | ATO16N TAUPE | | 24.97 | 39.97 |
| 3085 | 1168 | 5010 | 50 | TAHIRA - FLAT BLACK M | ATO16N BLK | | 24.33 | 39.97 |
| 3085 | 1168 | 6000 | 60 | OPHELIA - MJ PUMP BLACK N | AO6000N | 10-10-13 | 45.76 | 29.99 |
| 3085 | 1168 | 6001 | 60 | OPHELIA - MJ PUMP BLK M | AO6000M | 10-10-13 | 45.63 | 29.99 |
| 3085 | 1168 | 6010 | 30 | OLIVYA - SHOOTIE BROWN M | AO6007N | 10-09-13 | 46.64 | 29.99 |
| 3085 | 1168 | 6010 | 60 | OLIVYA - SHOOTIE BLK M | AO6007N | 10-09-13 | 48.92 | 29.99 |
| 3085 | 1168 | 5800 | 69 | POPPY - SLIDE BLUE | APO58 | 2-26-14 | 36.59 | 29.99 |
| 3085 | 1168 | 5800 | 93 | POPPY - SLIDE OYSTER | APO58 | 4-09-14 | 37.96 | 29.99 |
| 3085 | 1168 | 5801 | 50 | POPPY - SLIDE BLACK M | APO58M | 2-26-14 | 36.98 | 29.99 |
| 3085 | 1168 | 5801 | 80 | POPPY - SLIDE RED M | APO58M | 2-26-14 | 36.98 | 29.99 |
| 5087 | 1168 | 6000 | 16 | MORGAN-VENETIAN TAUPE N | ABM-6010N | 7-17-13 | 42.81 | 29.99 |
| 5087 | 1168 | 18 | 18 | MORGAN-VENETIAN TAN N | ABM-6010N | 7-16-13 | 44.25 | 29.99 |
| 5087 | 1168 | 6000 | 33 | MORGAN-VENETIAN COGNAC N | ABM6010N COGN | 9-05-13 | 43.61 | 29.99 |
| 5087 | 1168 | 6000 | 50 | MORGAN-VENETIAN BLK N | ABM6010N BLK | 9-05-13 | 43.47 | 29.99 |
| 5087 | 1168 | 6001 | 30 | MORGAN-VENETIAN COGNAC M | ABM-6010M | 9-05-13 | 43.68 | 29.99 |
| 5087 | 1168 | 6001 | 50 | MORGAN-VENETIAN BLK M | ABM6010M | 9-05-13 | 43.63 | 29.99 |
| 5087 | 1168 | 6100 | 30 | MARSHALL-PENNY SDE BRN N | ABM6009N BRN | 7-22-13 | 37.90 | 29.99 |
| 5087 | 1168 | 6100 | 50 | MARSHALL-PENNY BLK N | ABM6009N BLK | 9-12-13 | 44.12 | 29.99 |
| 5087 | 1168 | 6101 | 30 | MARSHALL-PENNY SDE BRN M | ABM-6009M | 7-22-13 | 38.98 | 29.99 |
| 5087 | 1168 | 6101 | 50 | MARSHALL-PENNY BLK M | ABM6009M BLK | 9-12-13 | 44.16 | 29.99 |
| 5087 | 1168 | 6200 | 30 | HORTON-CHEVY BRT BLK N | ABM6011N BLK | 9-12-13 | 44.63 | 29.99 |
| 5087 | 1168 | 6200 | 50 | HORTON-CHEVY BRT BLK N | ABD-6014N | 3-12-14 | 44.98 | 29.99 |
| 5087 | 1168 | 6201 | 30 | DENTON-CAPTOE COGNAC N | ABD6014N | 2-27-14 | 44.98 | 29.99 |
| 5087 | 1168 | 6201 | 50 | DENTON-CAPTOE BLK N | ABD-6014N | 2-27-14 | 44.05 | 29.99 |
| 5087 | 1168 | 6400 | 30 | DUNMORE-ISKTOE SQ BRN N | PV-ABD-6013N | 9-05-13 | 43.21 | 29.99 |
| 5087 | 1168 | 6400 | 50 | DUNMORE - ISKTOE SQ BLK N | ABD6013N BLK | 2-27-14 | 43.20 | 29.99 |
| 5087 | 1168 | 6401 | 30 | DUNMORE-ISKTOE SQ BRN M | ABD-6013M | 9-05-13 | 43.14 | 29.99 |
| 5087 | 1168 | 6401 | 50 | DUNCAN-WING TIP SD BLK M | ABD-6013M | 1-15-14 | 42.34 | 29.99 |
| 5087 | 1168 | 6500 | 30 | DALTON-MOC TOE COGNAC N | ABD6017N CON | 9-05-13 | 44.62 | 29.99 |
| 5087 | 1168 | 6500 | 50 | DALTON-MOC TOE BLK N | ABD6017N | 1-15-14 | 44.42 | 29.99 |
| 5087 | 1168 | 6501 | 30 | DALTON-MOC TOE COGNAC M | ABD-6017M | 9-05-13 | 44.69 | 29.99 |
| 5087 | 1168 | 6501 | 50 | DALTON-MOC TOE BLK M | ABD-6017M | 1-15-14 | 44.69 | 29.99 |
| 5087 | 1168 | 6500 | 30 | DUNCAN-WING TIP COGNAC M | ABD-6018M | 7-22-13 | 45.27 | 29.99 |
| 5087 | 1168 | 6601 | 30 | DENYON-PLAIN TOE BLK N | ABD6016N | 7-22-13 | 45.37 | 29.99 |
| 5087 | 1168 | 6601 | 50 | DENYON-PLAIN TOE BLK N | ABD-6016N | 1-15-14 | 44.10 | 29.99 |
| 5087 | 1168 | 6601 | 50 | DENYON-PLAIN TOE BLK M | ABD-6016N | 1-15-14 | 41.20 | 31.04 |

**Vendor~Item Stock & Sales Recap 6/8/2019**  —  Run Date: 6/10/2019

| Class | Vend | Style | Color | Desc | VenSty | Last Recpt* | Cost* | Retail* | Hid* | DCOH | Open as of 6/10 | Rcpts after 6/8 | PreDue as of 6/10 | Due before 6/28 | Models Qty | #Strs | Store OH WE 6/8 | #Strs | WE 6/8 | %Sld | WK 6/1 | MTD 5/28 | STD 12/30 | %Sld | YTD 12/30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3283 | 1160 | 1000 | 60 | ASHLIN-ATHLETIC BLACK | ROA-1000 BLK | 4-23-14 | 23.12 | 29.99 | 1 | -1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 2 | 0 | 0.0% | 0 | 0 | 5 | 62.5% | 5 |
| 3283 | 1160 | 1000 | 90 | ASHLIN-ATHLETIC WHITE | ROA-1000 WHT | 9-30-13 | 33.81 | 29.99 | 1 | -1 | 0 | 0 | 0 | 0 | 0 | 0 | 20 | 2 | 0 | 0.0% | 0 | 0 | 37 | 64.9% | 37 |
| 3283 | 1160 | 1002 | 41 | AUBREY-ATHLETIC GREY-DHE | ROA-1002 GRY-DH | 4-23-14 | 31.96 | 29.99 | 1 | -3 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0.0% | 0 | 0 | 3 | 60.0% | 3 |
| 3283 | 1160 | 1002 | 60 | AUBREY-ATHLETIC BLK-PNK | ROA-1002 BLK-PK | 9-30-13 | 32.41 | 29.99 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0.0% | 0 | 0 | 0 | 0.0% | 0 |
| 3283 | 1160 | 1002 | 184 | AUBREY-ATHLETIC WHT-PR | ROA-1002 WHT-PR | 9-09-13 | 36.59 | 29.99 | 1 | -3 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 2 | 0 | 0.0% | 0 | 0 | 13 | 76.5% | 13 |
| 3283 | 1160 | 1002 | 301 | AUBREY-ATHLETIC CHAR-PURP | ROA-1002 CHR-PU | 4-02-14 | 32.33 | 29.99 | 1 | -3 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 2 | 0 | 0.0% | 0 | 0 | 4 | 33.3% | 4 |
| 3283 | 1160 | 1016 | 60 | ANISE-ATHLETIC BLACK | ROA-1016 BLK | 8-27-14 | 35.10 | 29.99 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 1 | 0 | 0.0% | 0 | 0 | 0 | 0.0% | 0 |
| 3383 | 1160 | 1010 | 43 | ASTRO-ATH CHAR-SANGRIA | ROA-0010W-CHRSAN | | 21.72 | 29.99 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -1 | 1 | 0 | 0.0% | 0 | 0 | 0 | 0.0% | 0 |
| 3383 | 1160 | 1010 | 60 | BETHANI-M1 BLACK | ROS-1010 BLK | 7-29-15 | 44.87 | 29.99 | 1 | -5 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 3 | 0 | 0.0% | 0 | 0 | 27 | 71.1% | 27 |
| 5083 | 1160 | 1010 | 08 | BETHANI-MARY JANE PEWTER | ROS-1010 PWT | 3-03-15 | 41.50 | 29.99 | 1 | -1 | 0 | 0 | 0 | 0 | 0 | 0 | 286 | 3 | 1 | 3.7% | 0 | 0 | 5 | 83.3% | 5 |
| 5083 | 1160 | 1011 | 60 | BAILEY-05 BLACK | ROB-1011 BLK | 3-30-13 | 43.25 | 29.99 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 0 | 0.0% | 0 | 0 | 8 | 23.5% | 8 |
| 5083 | 1160 | 1005 | 60 | BASKETT-TIE BLK | ROB1005 BLK | 4-04-14 | 45.01 | 29.99 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13 | 2 | 0 | 0.0% | 0 | 0 | 17 | 56.7% | 17 |
| 5283 | 1160 | 1001 | 43 | AMTRIM-CHARCOAL(PX) | ROA1001 CHR | 3-05-14 | 36.59 | 29.99 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0.0% | 0 | 0 | 4 | 80.0% | 4 |
| 5283 | 1160 | 1001 | 60 | AMTRIM-BLK(P) | ROA1001 BLK | 3-30-13 | 37.79 | 29.99 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 1 | 0 | 0.0% | 0 | 0 | 0 | 0.0% | 0 |
| 5283 | 1160 | 1003 | 40 | ARCHER-GRY | ROA1003 GRY | 3-05-14 | 36.08 | 29.99 | 1 | -3 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0.0% | 0 | 0 | 2 | 100.0% | 2 |
| 5283 | 1160 | 1003 | 43 | ARCHER-CHARCOAL | ROA1003 CHR | 3-05-14 | 37.30 | 29.99 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0.0% | 0 | 0 | 15 | 93.8% | 15 |
| 5283 | 1160 | 1003 | 60 | ARCHER-BLK(PX) | ROA1003 BLK | 2-24-14 | 36.92 | 29.99 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0.0% | 0 | 0 | 9 | 100.0% | 9 |
| 5283 | 1160 | 1003 | 69 | ARCHER-BLUE(PX) | ROA1003 BLU | 8-30-13 | 38.00 | 29.99 | 1 | -1 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 3 | 0 | 0.0% | 0 | 0 | 0 | 0.0% | 0 |
| 5283 | 1160 | 1003 | 91 | ARCHER-WHT-GREY(PX) | ROA1003 WHT | 8-30-13 | 38.23 | 29.99 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 2 | 0 | 0.0% | 0 | 0 | 2 | 20.0% | 2 |
| 5583 | 1160 | 1017 | 32 | BAYLOR-TIE DK BRN-BLK | ROB1017 BRN | 4-04-14 | 44.11 | 29.99 | 1 | -2 | 0 | 0 | 0 | 0 | 0 | 0 | 17 | 3 | 0 | 0.0% | 0 | 0 | 36 | 67.9% | 36 |
| 5583 | 1160 | 1007 | 60 | BAYLOR- BLK-BLK | ROB1007 BLK | 8-30-13 | 46.74 | 29.99 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 2 | 0 | 0.0% | 0 | 0 | 3 | 33.3% | 3 |
| | 1160 | Total for | | ABEO ROCS (OASIS) | | | 37.52 | 29.99 | | -14 | 0 | 0 | 0 | 0 | 0 | 0 | 136 | 36 | 1 | 0.7% | 0 | 2 | 202 | 59.8% | 202 |
| | | Report Total | | | | | | | | -14 | 0 | 0 | 0 | 0 | 0 | 0 | 136 | 36 | 1 | 0.7% | 0 | 2 | 202 | 59.8% | 202 |

* As of import run time

ABEO ROCS   01169
Stores

david.cox@shoelogic.com  /  pathak.shim@shoelogic.com

1 of 1

## SOURCING AGREEMENT

This Product Sourcing, Production and Quality control Agreement ("Agreement") is entered into as of May 15th 2012 and between

*THE WALKING COMPANY*
*25 W. Anapamu Street*
*Santa Barbara, California 93101*
*USA*

The company shown above for brevity and simplicity will henceforth be referred to as THE WALKING COMPANY; with its principal offices as stated above, and SHOELOGICS LTD. henceforth referred to as SHOELOGICS; with its principal offices at

Room 2402, 24th floor,
101 Kings Road,
Fortress Hill
Hong Kong.

In consideration of the mutual promises and conditions contained herein, the receipt and sufficiency of which are hereby acknowledged,

1.  Purpose: The purpose of this Agreement is to confirm the engagement of SHOELOGICS by THE WALKING COMPANY for the procurement of the product indentified below, on a non-exclusive basis, through suppliers in the Territory, and to specify the obligations of SHOELOGICS in connection with providing such services. In addition, this Agreement specifies the obligations of THE WALKING COMPANY to SHOELOGICS and the conditions under which services will be provided.

2.  Effective Date: *15 May 2012*

3.  Territory: Asia Pacific Region. Not including *India, Pakistan, Turkey)*

4.  Product covered in this Agreement:   Footwear.

5.  Term and Termination:  The term of this engagement by THE WALKING COMPANY of SHOELOGICS shall be two (2) years from the Effective Date, unless terminated earlier by either party, with or without cause, upon giving written notice to the other party hereto at any time. Upon expiration of the initial two (2) year Term, the parties may further extend this Agreement by mutual agreement.

6.  SHOELOGICS will be responsible for all development, commercialization and factory placement services to THE WALKING COMPANY in creating seasonal footwear lines. SHOELOGICS shall handle all aspects of materials, development, commercialization, pricing, production tracking and quality control pursuant to a mutually agreed upon timetable.

7.  All parties understand and agree that the exact number of styles, the category, the delivery dates, the pricing, and the Product names are subject to modification based upon reasonable business determinations.

8.  Parties specifically understand and agree that all design and development decisions shall be made in conjunction with THE WALKING COMPANY.

9.  SHOELOGICS agrees to provide THE WALKING COMPANY with written reports, outlining work completed, assessing progress to date, proposed changes to timetable for deliverables and any other information which may

be deemed to be reasonably related to the development, commercialization, costings and sourcing of THE WALKING COMPANY's Products.

10. SHOELOGICS shall assist THE WALKING COMPANY in the implementation of a timetable and fully support THE WALKING COMPANY for the development of Products to be launched in each season.

11. Authorized Suppliers: SHOELOGICS Assistance: SHOELOGICS shall familiarize itself with THE WALKING COMPANY and THE WALKING COMPANY customers' needs and expectations.

12. SHOELOGICS shall recommend to THE WALKING COMPANY factories in the Territory that are capable of producing goods in compliance with THE WALKING COMPANY'S quality standards within the required production dates. Only those factories that are then approved by THE WALKING COMPANY shall be deemed "Authorized Suppliers", SHOELOGICS shall work with Authorized Suppliers in providing services under this Agreement. Supplier List: SHOELOGICS shall maintain and provide to THE WALKING COMPANY at THE WALKING COMPANY's request, an up-to-date listing of the names and locations of all Authorized Suppliers. SHOELOGICS agrees to notify THE WALKING COMPANY in writing of any deletions from the list of Authorized Suppliers.

13. Price Negotiation: SHOELOGICS shall, on behalf of THE WALKING COMPANY, negotiate the best possible prices from the Authorized Suppliers for THE WALKING COMPANY footwear products. SHOELOGICS will then quote to THE WALKING COMPANY the negotiated prices at which the product can be purchased.

14. Samples: SHOELOGICS will not be responsible for sample costs, including materials and tooling as well as all sample dispatch charges, or local taxes. This is inclusive of transit from point of manufacture; and when necessary, the cost of translating product specifications or quality control manuals into another language.

15. Expenses: SHOELOGICS shall be responsible for all local expenses incurred in connection with the performance of its services hereunder, including by way of example and not by way of limitation, salaries, local travel, promotional and operational expenses.
   The term *local* refers to journeys that do not require an overnight stay or air travel to another province of China. See appendix C and D Expenses.

16. The costs of any long distance or international travel of SHOELOGICS not covered under this Agreement will be paid for by THE WALKING COMPANY only if pre--approved in writing by THE WALKING COMPANY, and will be invoiced separately by SHOELOGICS. See appendix C and D expenses

17. Intellectual Property Usage: SHOELOGICS will use its best efforts in maintaining control of the purchase, use and disposition of all labels, tooling, accessories and packaging material bearing THE WALKING COMPANY 's and its associate's trademarks, trade name and copyrights. SHOELOGICS shall provide copies of all such agreements presented to SHOELOGICS from any factories or vendor to THE WALKING COMPANY for its confirmation and signature.

18. Testing: THE WALKING COMPANY is responsible for providing a detailed list of all testing requirements for the products quoting specific Standard test requirement numbers   as agreed with the authorized authorities for the end use countries.

19. The cost for any external approval and verification testing over and above the normal factory test procedures are to be borne exclusively by THE WALKING COMPANY. "Normal factory test procedures" to be provided to THE WALKING COMPANY for review during development stage.

20. The Authorized Supplier shall be solely responsible for ensuring that all Products meet all THE THE WALKING COMPANY applicable international, national and local testing criteria and standards. SHOELOGICS shall use its best efforts to ensure that all necessary testing is done per the requirements by Authorized Supplier and that the testing required by THE WALKING COMPANY is performed at the laboratory specified and all results of such testing is provided to THE WALKING COMPANY in a timely manner and per the instructions of THE WALKING COMPANY.

21. <u>Compensation:</u>
During the duration of this contract The WALKING COMPANY agrees to pay SHOELOGICS the basic monthly 5000$ retainer plus 4% of the FOB value of the goods inspected and shipped out

> This monthly retainer covers SHOELOGICS direct costs working on behalf of THE WALKING COMPANY in Asia for the duration of this contract taken from the date the contract is signed.

> The first retainer each month of USD *5000* is to be to be paid within 7 days from the agreed start date of this contract for the services provided for the following month, and on the same day each month thereafter.

> This amount is to be deposited in an account in Hong Kong and is to be paid net of any originating country's withholding taxes or bank charges.

> At the end of the contract period SHOELOGICS reserve the right to renegotiate this retainer payment with THE WALKING COMPANY as to any extension.

The 4% payment is calculated per P.O inspected by Shoelogics calculated from the final inspection report for orders being shipped out Commission (4%) to be paid after receipt and QC inspection at THE WALKING COMPANY North Carolina distribution center.

Shoe Logics agrees not to accept any compensation from factories with orders that were placed on behalf of TWC.

22. *SHOELOGICS Responsibilities:*

- All communication through factories
- Tooling initiation and optimization
- Delivery of wear test samples
- Delivery of fit test samples
- Assist in verifying and negotiating FOB costs
- Verify and confirm factory CBD's to THE WALKING COMPANY are accurate and factual
- Commercialization to agreed deadlines
- Identify appropriate factories for production, reviewing at least 3 factory options.
- Assisting factories in optimizing production through the commercialization process.
- Ensuring that all products are produced to required quality standards and a valid inspection certificate is issued to The WALKING COMPANY for each P.O.
- In partnership with THE WALKING COMPANY establish standards for fit, function and testing to keep all shoes consistent for THE WALKING COMPANY products

- Establishing and employing "Best Practices and Processes" to establish a system for footwear production.
- Verify and provide to the factory and THE WALKING COMPANY, materials swatch books per style ( SKU) with agreed and signed materials for production
- Full on-line quality control of Production and final inspection of Products.
- Monitoring production schedules and timelines to achieve pre agreed ex factory shipping dates.
    - Monitor whether any factories supply product to THE WALKING COMPANY are tainted by child labor, slavery or human trafficking, and report to THE WALKING COMPANY any violations .

    - Reserve the right to require each factory periodically to acknowledge in writing its compliance with applicable laws (including laws against child labor, slavery and human trafficking).

      Monitor factories and reserve the right to inspect factories to ensure compliance with C-TPAT security guidelines as indicated on the C-TPAT Foreign Manufacturer Security Criteria provided by The Walking Company
    - Reserve the right to inspect factories for compliance with applicable laws and to terminate any factory that fails to comply with applicable laws or to cooperate in any such inspection.

    - Reserve the right to terminate any vendor who fails to comply with applicable laws or to cooperate in any inspection of its premises, subject to the opportunity to cure the failure where appropriate.

23. <u>THE WALKING COMPANY's Responsibilities include when appropriate:</u>

- Development technical package hand-off – sketch, development specification and objectives
- Measurements, Lateral, toe and back views.
- Materials swatches/material specifications, mock-ups, etc.
- Provide target FOB prices and forecasts per project
- Fit and wear test results and comments
- Provide colors, Pantone numbers for new colours
- Provide SHOELOGICS with an estimated advance one (1) year line projection plan which shall serve as a foundation for the development of Products pursuant to this Agreement
- Signed approval of confirmation samples
- Final confirmation of product, production specifications
- Final confirmation of materials swatch books for production.
- Final Product confirmation and confirmation of FOB costs.
- Provide timely forecasts per season, per style
- Provide copies of purchase orders as soon as available.
- Adequate notice of orders due to be shipped out of approved vendors premises
- Agree shipping dates with SHOELOGICS and the factories.
- In the event of a dispute over the quality of goods received, THE WALKING COMPANY is required to give notice of this dispute in Writing within 2 working days of the goods being received into the warehouse.
- Direct payments to the factories for goods to be shipped per agreed upon payment terms.

- Provide to the factories correct documentation that  allow LC payments to be raised and goods shipped out on time
- Agree product quality standards with SHOELOGICS
- Provide SHOELOGICS with Timely feedback on delivered goods, quality and accuracy to purchase order.

24. <u>Conditions for Quality control and delivery of finished goods</u> SHOELOGICS undertake and verify that given adequate notice of orders scheduled to ship from a factory SHOELOGICS will inspect all Purchase orders in the Authorized Suppliers premises prior to Shipment.

25. SHOELOGICS will undertake inspection according to established International LOT size RANDOM SAMPLING techniques, these are according to the figures shown on appendix A.

It is to be recognized and attested that in any given INSPECTION LOT there will be an anticipated % of major and minor defects due to the very labour intensive nature of Footwear manufacture and has to be considered as normal for delivered products. The maximum % of major/minor defects allowed will follow the Appendix A chart.

26. FATAL DEFECTS are shown in Appendix B; these will result in 100% reinspection prior to Shipment.

27. SHOELOGICS will provide a final inspection report to THE WALKING COMPANY LTD for each purchase order inspected before shipment.

28. In the event that any purchase order that has been inspected by SHOELOGICS with a final Inspection report has failed QC inspection upon receipt by THE WALKING COMPANY DC QC staff or has been returned by the end use customer as defective or containing critical product failures then THE WALKING COMPANY shall notify SHOELOGICS of this QC failure or customer complaint or return, the numbers involved, and the exact nature of the complaint. The product has to be made available for SHOELOGICS to inspect if required.

Upon reinspection of the goods, if the defects are found to exceed the % ratios found in APPENDIX A, then SHOELOGICS will undertake to follow up with the sourcing factories to obtain a refund for the defective goods shipped.  Credited amount will include FOB cost, freight cost, duty cost.

Upon reinspection of the goods, if the defects found do not exceed the % ratios found in APPENDIX A then no further claim shall be forthcoming to SHOELOGICS or the Authorized suppliers, they shall be deemed as falling within acceptable quality constraints.

SHOELOGICS reserves the right to claim under the circumstances shown in clause 30 any and all expenses including employee time to reinspect these products if this inspection has occurred outside of the Asia Pacific region. This is only applicable if the defects found to not exceed the % ratios found in APPENDIX A.

In addition if the claim for sub standard quality is found to be justified then SHOELOGICS will forfeit the commission % for this specific P.O, and in addition will be responsible for all expenses incurred to reinspect the goods.

29. In the event that a Purchase Order requires 100% re-inspection in Asia and defects are still found and not repairable,  it is the decision of THE WALKING COMPANY to accept known defects or reject the shipment.  If shipment is accepted with known defects, then upon arrival and inspection at TWC DC, the same known defects are excluded and no claim can be against same known defects.  However, if new defects are discovered, then normal claim procedure would follow for new defect only.

30 Relationship of Parties: SHOELOGICS shall provide services to THE WALKING COMPANY for THE WALKING COMPANY's customers only for the purposes and to the extent set forth in this Agreement. SHOELOGICS relationship to THE WALKING COMPANY during the period or periods of provision of services hereunder shall be that of an Independent Contractor.

31 SHOELOGICS and THE WALKING COMPANY understand and agree that SHOELOGICS is not, and shall not be an employee of THE WALKING COMPANY. SHOELOGICS shall not be considered as having an employee status or as being entitled to participate in any plans, arrangements or distributions by THE WALKING COMPANY pertaining to or in connection with any pension, stock, bonus, profit sharing or similar benefits for THE WALKING COMPANY's regular employees.

32 This agreement is not intended to and does not create a partnership or joint venture. SHOELOGICS has no authority to enter into contracts on behalf of THE WALKING COMPANY or otherwise act for or bind THE WALKING COMPANY. SHOELOGICS agrees that it shall not represent to any third party that it has any such authority.

33 Ownership of Work Product: SHOELOGICS acknowledges and agrees that all worldwide right, title and interest in and to any and all work, product, designs, works of authorship, trademarks, pictorial reproductions, drawings, graphic representations, deliverables, improvements, innovations, discoveries and inventions conceived, made or reduced to practice while performing services under this Agreement (collectively, the "Work Product") shall be the sole property of THE WALKING COMPANY.

34 SHOELOGICS hereby agrees to assign, and does hereby assign, to THE WALKING COMPANY all worldwide right, title and interest in and to the Work Product, including, without limitation, all patent rights, trademarks, service marks, copyrights, trade secret rights and other proprietary rights.

35 THE WALKING COMPANY shall own any results of SHOELOGICS work under this Agreement in its entirety, together with the performances embodied thereon and all the results and proceeds of SHOELOGICS services hereunder throughout the universe in perpetuity, free of any and all claims by SHOELOGICS or any person, corporation, partnership or any other entity deriving any rights from SHOELOGICS.

36 SHOELOGICS agrees to execute additional documentation confirming THE WALKING COMPANY's sole ownership of the Work Product and its underlying intellectual property; to the extent SHOELOGICS does not do so, SHOELOGICS hereby authorizes THE WALKING COMPANY to sign such documents on SHOELOGICS behalf.

37 Confidentiality

"Confidential Information" includes, but is not limited to, all information proprietary to THE WALKING COMPANY, whether or not reduced to writing or other tangible medium of expression, and whether or not patented, patentable, capable of trade secret protection or protected as an unpublished or published work. Confidential Information also includes information relating to the Intellectual Property and Business Practices of THE WALKING COMPANY.

Confidential Information also includes comparable information that THE WALKING COMPANY may receive or has received from others who do business with WALKING COMPANY. Confidential Information does not include information which (a) was already known to SHOELOGICS prior to its contact with THE WALKING COMPANY as established by SHOELOGICS records, (2) becomes generally available to the public other than through a breach of this Agreement, or (3) is furnished to SHOELOGICS by a third party who is lawfully in possession of such information and who lawfully conveys that information.

"Intellectual Property" includes information relating to research and development, inventions, discoveries, development, improvement, methods and processes, know-how, drawings, blueprints, specifications, product briefs, concepts, designs, prototypes, models, samples, screens, moulds, lasts, patents, copyright, trademarks, trade names, trade secrets and patent, trademark, and copyright applications.

"Business Practices" includes information relating to Intellectual Property, business plans, financial information, products, services, manufacturing processes and methods, costs, sources of supply, advertising and marketing plans, customer lists, sales, profits, pricing methods, personnel, and business relationships.

Treatment and Protection of Confidential Information: SHOELOGICS acknowledges that, during the course of their relationship with THE WALKING COMPANY, THE WALKING COMPANY may disclose or SHOELOGICS may learn of Confidential Information. SHOELOGICS agrees to comply with THE WALKING COMPANY's policies and procedures for protecting Confidential Information.

SHOELOGICS agrees that it shall not: (a) use, except as required by the normal and proper course of performing under this Agreement and in SHOELOGICS business relationship with THE WALKING COMPANY, (b) disclose, (c) copy, or (d) allow access to, Confidential Information without the express prior written consent of THE WALKING COMPANY. These restrictions will continue to apply after the completion or termination of this Agreement as long as the confidential nature of the information is maintained. All Confidential Information and media containing such Confidential Information is the property of THE WALKING COMPANY.

Marking Confidential Information: SHOELOGICS shall mark all Confidential Information with legends as specified and required by THE WALKING COMPANY and shall take all actions deemed necessary by THE WALKING COMPANY to protect and perfect THE WALKING COMPANY's rights therein.
Return of property: SHOELOGICS agrees to return to THE WALKING COMPANY promptly upon the completion or termination of this Agreement, or at any other time when requested by THE WALKING COMPANY, all property of THE WALKING COMPANY, including but not limited to all Confidential Information and copies thereof.

Employees and Third Parties: SHOELOGICS shall make its principals and independent contractors aware of the confidentiality obligations of this Agreement. SHOELOGICS shall require its principals, and independent contractors to execute confidentiality agreements in form and substance satisfactory to THE WALKING COMPANY undertaking an obligation of confidentiality comparable to that provided in this Agreement.

38 Representations, Warranties and Indemnification:

SHOELOGICS represents and warrants that (i) it will perform the services required of it hereunder to the best of its abilities and will comply with all instructions issued to it by THE WALKING COMPANY ; (ii) it has the full right, power and authority to enter into and perform this Agreement; (iii) it is not subject to any conflicting obligation which will or might prevent, or interfere with, the execution and

performance of this Agreement; (iv) it shall comply with all of the terms and conditions of this Agreement.

SHOELOGICS represents and warrants that the footwear, materials and components designed and developed under this Agreement will be designed so that they may be manufactured by a variety of manufacturers suitable to THE WALKING COMPANY  and will not be designed solely or exclusively to SHOELOGICS' manufacturing capabilities.

SHOELOGICS represents and warrants that all services provided under this Agreement shall be performed in a timely and professional manner and that SHOELOGICS is competent, qualified and experienced to the extent necessary to perform such services.

SHOELOGICS represents and warrants that SHOELOGICS has and will maintain in force all licenses and permits required of workshop by law or regulation, and SHOELOGICS will fully comply with all local laws, ordinances and regulations applicable to SHOELOGICS.

SHOELOGICS represents and warrants that there are no other agreements, written or oral, conveying to any third party any rights in any work to be created by SHOELOGICS under this agreement.

SHOELOGICS represents and warrants that it will not incorporate in any work to be created under this agreement any designs, works of authorship, trademarks, pictorial reproductions, drawings, graphic representations, improvements, innovations, discoveries or inventions belonging to any third party or in which any third party claims an interest.

THE WALKING COMPANY represents and warrants that (i) it has the full right, power and authority to enter into and perform this Agreement; (ii) it is not subject to any conflicting obligation which will or might prevent, or materially interfere with, the execution and performance of this Agreement; and (iii) it shall comply with all of the terms and conditions of this Agreement.

Indemnification: Each party agrees that it shall indemnify and hold the other party hereto and that party's successors, assigns, affiliates, agents, officers, directors, employees and shareholders, harmless from and against any liability, claim, action, judgment, cost, damage or expense (including reasonable attorneys' fees) arising out of or in connection with any breach or alleged breach by it of any representation, warranty or agreement contained in this Agreement.

## 39 Disputes for products already placed with existing suppliers, or are already in Production already or in transit

SHOELOGICS will not bear any financial liability of possible disputes for any goods that are already in the factory production process or in transit.  This includes orders where materials have been purchased, tooling or molds opened.

Products that are considered below acceptable quality standards due to poor development in the past prior to SHOELOGICS involvement and where it is known that the product is unable to be made to a suitable quality standard in the future.

Products or Purchase orders placed prior to this agreement with SHOELOGICS taking effect that fall under these criterions shown above will be given and agreed with THE WALKING COMPANY.

SHOELOGICS will undertake to achieve the best possible on time delivery dates and quality standards. THE WALKING COMPANY should confirm and attest that product on time % delivery from current suppliers can be expected to be marginal.

40  **Entire Agreement: Amendments:** This Agreement contains the entire understanding between the parties with respect to its subject matter and supersedes any and all prior agreements, whether oral or written. No amendment or modification shall be of any effect unless it is in writing and duly signed by an authorized representative of each party.

**Governing Law:** This Agreement shall be governed by the laws of the State of California.  With respect to any disagreement, dispute, controversy or claim arising out of, or relating to, this Agreement or any interpretation of this Agreement, and solely for the purposes of this Agreement, each of the parties to this Agreement irrevocably submits to the exclusive jurisdiction of the courts of the State of California, County of Santa Barbara, or the federal courts for the Central District of California. In addition, each party irrevocably waives, to the extent permitted by law: (i) any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement brought in any such court, (ii) any claim that any such suite, action or proceeding brought in any such court has been brought in an inconvenient forum, (iii) the right to object, with respect to any such claim, suit, action or proceeding brought in any such court, that such court does not have jurisdiction over such party or the other party to this Agreement, (iv) trial by jury, and the parties agree that it is executed and delivered in that state, and any claims arising,  and (v) any requirements for personal service of process or other condition for such party to be subject to a complaint brought hereunder.

**No Assignment:** This Agreement may not be assigned or delegated by SHOELOGICS in whole or in part without THE WALKING COMPANY prior written consent.

**Severability:** If any provision of this Agreement should, for any reason, be held invalid or unenforceable in any respect, such provision shall be enforced to the fullest extent possible to effectuate the intent of the parties and the remainder of this Agreement shall be enforced to the fullest extent permitted by law.

**Notices:** All notices given pursuant to or concerning this Agreement must be in writing and must be given by hand delivery, by overnight mail or by facsimile, to the addresses set forth on page 1 hereof, and shall be deemed given on the date delivered or if sent by facsimile, the day after sending, or if sent by overnight mail, three (3) days after the date of mailing. An address for notice may be changed from time to time by either party by giving notice as provided herein.

**Headings:** Headings are used in this Agreement as a matter of convenience only and shall have no bearing on the interpretation of this Agreement.

**Force Majeure:** No party shall be liable for any failure to perform its obligations in connection with any action described in this Agreement, if such a failure results from any act of God, riot, war, terrorism, civil unrest, flood, earthquake, or cause beyond such party's reasonable control (including any mechanical, electronic, or communications failure, but excluding failure caused by a party's financial condition or negligence).

**Governing Language:** This Agreement has been written and executed in English. In the event any translation of this Agreement into another language is made, the English language version of this Agreement shall govern in case of any conflict.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date written below:

For and on behalf of:

**SHOELOGICS**

  By:

Name:

Title:

Date:

For and on behalf of:

**THE WALKING COMPANY**

By: *Susan Minier*

Name: *Susie Minier*

Title: *Senior Vice President*

Date: 8-21-12

APPENDIX A INSPECTION LOTS

| LOT SIZE | SAMPLE QTY | PAIRS NEEDED | maximum allowed faults | | |
|---|---|---|---|---|---|
| | | | Major | Minor | Total |
| | | | Defect Q'ty | Defect Q'ty | Defect Q'ty |
| UNDER 500 | 50 | 4 PRS * 12 CASES 2PRS * 1 CASES | 2 | 4 | 6 |
| 501 ~1200 | 80 | 4 PRS * 20 CASES | 3 | 6 | 9 |
| 1201 ~3200 | 125 | 5 PRS * 25 CASES | 5 | 9 | 14 |
| OVER 3200 | 150 | 5 PRS * 30 CASES | 6 | 11 | 17 |

APPENDIX B LIST OF FATAL FLAWS THAT REQUIRE 100% INSPECTION

| FATAL DEFECTS, 100% REINSPECT IF FOUND | |
|---|---|
| 1 | NAILS, TACKS, SEWING NEEDLES, INSIDE SHOE |
| 2 | MAJOR ADHESION SEPARATION (OUTSOLE/MIDSOLE/UPPER) |
| 3 | PRODUCT DOES NOT FOLLOW SPECIFICATION |
| 4 | INSIDE LINING PLEATED, BUMPS AND RIDGES |
| 5 | MAJOR CONSTRUCTIONAL PROBLEMS, STITCHING, METALWORK |

APPENDIX C,
TRAVEL CLAIM OUTLINES, *for employee living in Guangdong province full time contracted.*
Covers all areas of Guangdong province

| Item | Duration | claim | Totals estimated | Comments, all shown in USD |
|---|---|---|---|---|
| Hotel | Per stay | Per night | 45-60$ | regular room rates ,normal tourist hotel |
| food/drink | Per day | bills | 20-25$ | Per overnight stay only. |
| taxi/ferry/bus | as reqd | as reqd | 30-45$ | Local transport as required, receipts given |
| Misc | as reqd | as reqd | 10-15$ | phone bills, ticket entry miscellaneous charges |
| entertainment | None | none | 0$ | |

APPENDIX D Foreign travel expenses

Any travel that requires flights to different countries, including the USA shall be preagreed with THE WALKING COMPANY before the travel commences

EXHIBIT B

# SOURCING AGREEMENT

This Product Sourcing, Production and Quality control Agreement ("Agreement") is entered into as of May 15th 2012 and between

*THE WALKING COMPANY*
*25 W. Anapamu Street*
*Santa Barbara, California 93101*
*USA*

The company shown above for brevity and simplicity will henceforth be referred to as THE WALKING COMPANY; with its principal offices as stated above, and SHOELOGICS LTD. henceforth referred to as SHOELOGICS; with its principal offices at

Room 2402, 24th floor,
101 Kings Road,
Fortress Hill
Hong Kong.

In consideration of the mutual promises and conditions contained herein, the receipt and sufficiency of which are hereby acknowledged,

1. <u>Purpose</u>: The purpose of this Agreement is to confirm the engagement of SHOELOGICS by THE WALKING COMPANY for the procurement of the product indentified below, on a non-exclusive basis, through suppliers in the Territory, and to specify the obligations of SHOELOGICS in connection with providing such services. In addition, this Agreement specifies the obligations of THE WALKING COMPANY to SHOELOGICS and the conditions under which services will be provided.

2. <u>Effective Date</u>: *15 May 2012*
3. <u>Territory</u>: Asia Pacific Region. Not including *India, Pakistan, Turkey)*

4. Product covered in this Agreement:   Footwear.

5. <u>Term and Termination</u>:  The term of this engagement by THE WALKING COMPANY of SHOELOGICS shall be two (2) years from the Effective Date, unless terminated earlier by either party, with or without cause, upon giving written notice to the other party hereto at any time. Upon expiration of the initial two (2) year Term, the parties may further extend this Agreement by mutual agreement.

6. SHOELOGICS will be responsible for all development, commercialization and factory placement services to THE WALKING COMPANY in creating seasonal footwear lines. SHOELOGICS shall handle all aspects of materials, development, commercialization, pricing, production tracking and quality control pursuant to a mutually agreed upon timetable.

7. All parties understand and agree that the exact number of styles, the category, the delivery dates, the pricing, and the Product names are subject to modification based upon reasonable business determinations.

8. Parties specifically understand and agree that all design and development decisions shall be made in conjunction with THE WALKING COMPANY.

9. SHOELOGICS agrees to provide THE WALKING COMPANY with written reports, outlining work completed, assessing progress to date, proposed changes to timetable for deliverables and any other information which may

be deemed to be reasonably related to the development, commercialization, costings and sourcing of THE WALKING COMPANY's Products.

10. SHOELOGICS shall assist THE WALKING COMPANY in the implementation of a timetable and fully support THE WALKING COMPANY for the development of Products to be launched in each season.

11. Authorized Suppliers: SHOELOGICS Assistance: SHOELOGICS shall familiarize itself with THE WALKING COMPANY and THE WALKING COMPANY customers' needs and expectations.

12. SHOELOGICS shall recommend to THE WALKING COMPANY factories in the Territory that are capable of producing goods in compliance with THE WALKING COMPANY'S quality standards within the required production dates. Only those factories that are then approved by THE WALKING COMPANY shall be deemed "Authorized Suppliers", SHOELOGICS shall work with Authorized Suppliers in providing services under this Agreement. Supplier List: SHOELOGICS shall maintain and provide to THE WALKING COMPANY at THE WALKING COMPANY's request, an up-to-date listing of the names and locations of all Authorized Suppliers. SHOELOGICS agrees to notify THE WALKING COMPANY in writing of any deletions from the list of Authorized Suppliers.

13. Price Negotiation: SHOELOGICS shall, on behalf of THE WALKING COMPANY, negotiate the best possible prices from the Authorized Suppliers for THE WALKING COMPANY footwear products. SHOELOGICS will then quote to THE WALKING COMPANY the negotiated prices at which the product can be purchased.

14. Samples: SHOELOGICS will not be responsible for sample costs, including materials and tooling as well as all sample dispatch charges, or local taxes. This is inclusive of transit from point of manufacture; and when necessary, the cost of translating product specifications or quality control manuals into another language.

15. Expenses: SHOELOGICS shall be responsible for all local expenses incurred in connection with the performance of its services hereunder, including by way of example and not by way of limitation, salaries, local travel, promotional and operational expenses.
    The term *local* refers to journeys that do not require an overnight stay or air travel to another province of China. See appendix C and D Expenses.

16. The costs of any long distance or international travel of SHOELOGICS not covered under this Agreement will be paid for by THE WALKING COMPANY only if pre--approved in writing by THE WALKING COMPANY, and will be invoiced separately by SHOELOGICS. See appendix C and D expenses

17. Intellectual Property Usage: SHOELOGICS will use its best efforts in maintaining control of the purchase, use and disposition of all labels, tooling, accessories and packaging material bearing THE WALKING COMPANY's and its associate's trademarks, trade name and copyrights. SHOELOGICS shall provide copies of all such agreements presented to SHOELOGICS from any factories or vendor to THE WALKING COMPANY for its confirmation and signature.

18. Testing: THE WALKING COMPANY is responsible for providing a detailed list of all testing requirements for the products quoting specific Standard test requirement numbers   as agreed with the authorized authorities for the end use countries.

19. The cost for any external approval and verification testing over and above the normal factory test procedures are to be borne exclusively by THE WALKING COMPANY. "Normal factory test procedures" to be provided to THE WALKING COMPANY for review during development stage.

20. The Authorized Supplier shall be solely responsible for ensuring that all Products meet all THE THE WALKING COMPANY applicable international, national and local testing criteria and standards. SHOELOGICS shall use its best efforts to ensure that all necessary testing is done per the requirements by Authorized Supplier and that the testing required by THE WALKING COMPANY is performed at the laboratory specified and all results of such testing is provided to THE WALKING COMPANY in a timely manner and per the instructions of THE WALKING COMPANY.


21. Compensation:
During the duration of this contract The WALKING COMPANY agrees to pay SHOELOGICS the basic monthly 5000$ retainer plus 4% of the FOB value of the goods inspected and shipped out

> This monthly retainer covers SHOELOGICS direct costs working on behalf of THE WALKING COMPANY in Asia for the duration of this contract taken from the date the contract is signed.

> The first retainer each month of USD *5000* is to be to be paid within 7 days from the agreed start date of this contract for the services provided for the following month, and on the same day each month thereafter.

> This amount is to be deposited in an account in Hong Kong and is to be paid net of any originating country's withholding taxes or bank charges.

> At the end of the contract period SHOELOGICS reserve the right to renegotiate this retainer payment with THE WALKING COMPANY as to any extension.


The 4% payment is calculated per P.O inspected by Shoelogics calculated from the final inspection report for orders being shipped out Commission (4%) to be paid after receipt and QC inspection at THE WALKING COMPANY North Carolina distribution center.


Shoe Logics agrees not to accept any compensation from factories with orders that were placed on behalf of TWC.


22. *SHOELOGICS Responsibilities:*

- All communication through factories
- Tooling initiation and optimization
- Delivery of wear test samples
- Delivery of fit test samples
- Assist in verifying and negotiating FOB costs
- Verify and confirm factory CBD's to THE WALKING COMPANY are accurate and factual
- Commercialization to agreed deadlines
- Identify appropriate factories for production, reviewing at least 3 factory options.
- Assisting factories in optimizing production through the commercialization process.
- Ensuring that all products are produced to required quality standards and a valid inspection certificate is issued to The WALKING COMPANY for each P.O.
- In partnership with THE WALKING COMPANY establish standards for fit, function and testing to keep all shoes consistent for THE WALKING COMPANY products

- Establishing and employing "Best Practices and Processes" to establish a system for footwear production.
- Verify and provide to the factory and THE WALKING COMPANY, materials swatch books per style ( SKU) with agreed and signed materials for production
- Full on-line quality control of Production and final inspection of Products.
- Monitoring production schedules and timelines to achieve pre agreed ex factory shipping dates.
  - Monitor whether any factories supply product to THE WALKING COMPANY are tainted by child labor, slavery or human trafficking, and report to THE WALKING COMPANY any violations .

  - Reserve the right to require each factory periodically to acknowledge in writing its compliance with applicable laws (including laws against child labor, slavery and human trafficking).

    Monitor factories and reserve the right to inspect factories to ensure compliance with C-TPAT security guidelines as indicated on the C-TPAT Foreign Manufacturer Security Criteria provided by The Walking Company
  - Reserve the right to inspect factories for compliance with applicable laws and to terminate any factory that fails to comply with applicable laws or to cooperate in any such inspection.

  - Reserve the right to terminate any vendor who fails to comply with applicable laws or to cooperate in any inspection of its premises, subject to the opportunity to cure the failure where appropriate.

23. THE WALKING COMPANY's Responsibilities include when appropriate:

- Development technical package hand-off – sketch, development specification and objectives
- Measurements, Lateral, toe and back views.
- Materials swatches/material specifications, mock-ups, etc.
- Provide target FOB prices and forecasts per project
- Fit and wear test results and comments
- Provide colors, Pantone numbers for new colours
- Provide SHOELOGICS with an estimated advance one (1) year line projection plan which shall serve as a foundation for the development of Products pursuant to this Agreement
- Signed approval of confirmation samples
- Final confirmation of product, production specifications
- Final confirmation of materials swatch books for production.
- Final Product confirmation and confirmation of FOB costs.
- Provide timely forecasts per season, per style
- Provide copies of purchase orders as soon as available.
- Adequate notice of orders due to be shipped out of approved vendors premises
- Agree shipping dates with SHOELOGICS and the factories.
- In the event of a dispute over the quality of goods received, THE WALKING COMPANY is required to give notice of this dispute in Writing within 2 working days of the goods being received into the warehouse.
- Direct payments to the factories for goods to be shipped per agreed upon payment terms.

- Provide to the factories correct documentation that allow LC payments to be raised and goods shipped out on time
- Agree product quality standards with SHOELOGICS
- Provide SHOELOGICS with Timely feedback on delivered goods, quality and accuracy to purchase order.

24. <u>Conditions for Quality control and delivery of finished goods</u> SHOELOGICS undertake and verify that given adequate notice of orders scheduled to ship from a factory SHOELOGICS will inspect all Purchase orders in the Authorized Suppliers premises prior to Shipment.

25. SHOELOGICS will undertake inspection according to established International LOT size RANDOM SAMPLING techniques, these are according to the figures shown on appendix A.

It is to be recognized and attested that in any given INSPECTION LOT there will be an anticipated % of major and minor defects due to the very labour intensive nature of Footwear manufacture and has to be considered as normal for delivered products. The maximum % of major/minor defects allowed will follow the Appendix A chart.

26. FATAL DEFECTS are shown in Appendix B; these will result in 100% reinspection prior to Shipment.

27. SHOELOGICS will provide a final inspection report to THE WALKING COMPANY LTD for each purchase order inspected before shipment.

28. In the event that any purchase order that has been inspected by SHOELOGICS with a final Inspection report has failed QC inspection upon receipt by THE WALKING COMPANY DC QC staff or has been returned by the end use customer as defective or containing critical product failures then THE WALKING COMPANY shall notify SHOELOGICS of this QC failure or customer complaint or return, the numbers involved, and the exact nature of the complaint. The product has to be made available for SHOELOGICS to inspect if required.

Upon reinspection of the goods, if the defects are found to exceed the % ratios found in APPENDIX A, then SHOELOGICS will undertake to follow up with the sourcing factories to obtain a refund for the defective goods shipped. Credited amount will include FOB cost, freight cost, duty cost.

Upon reinspection of the goods, if the defects found do not exceed the % ratios found in APPENDIX A then no further claim shall be forthcoming to SHOELOGICS or the Authorized suppliers, they shall be deemed as falling within acceptable quality constraints.

SHOELOGICS reserves the right to claim under the circumstances shown in clause 30 any and all expenses including employee time to reinspect these products if this inspection has occurred outside of the Asia Pacific region. This is only applicable if the defects found to not exceed the % ratios found in APPENDIX A.

In addition if the claim for sub standard quality is found to be justified then SHOELOGICS will forfeit the commission % for this specific P.O, and in addition will be responsible for all expenses incurred to reinspect the goods.

29. In the event that a Purchase Order requires 100% re-inspection in Asia and defects are still found and not repairable,  it is the decision of THE WALKING COMPANY to accept known defects or reject the shipment.  If shipment is accepted with known defects, then upon arrival and inspection at TWC DC, the same known defects are excluded and no claim can be against same known defects.  However, if new defects are discovered, then normal claim procedure would follow for new defect only.

30 Relationship of Parties: SHOELOGICS shall provide services to THE WALKING COMPANY for THE WALKING COMPANY's customers only for the purposes and to the extent set forth in this Agreement. SHOELOGICS relationship to THE WALKING COMPANY during the period or periods of provision of services hereunder shall be that of an Independent Contractor.

31 SHOELOGICS and THE WALKING COMPANY understand and agree that SHOELOGICS is not, and shall not be an employee of THE WALKING COMPANY. SHOELOGICS shall not be considered as having an employee status or as being entitled to participate in any plans, arrangements or distributions by THE WALKING COMPANY pertaining to or in connection with any pension, stock, bonus, profit sharing or similar benefits for THE WALKING COMPANY's regular employees.

32 This agreement is not intended to and does not create a partnership or joint venture. SHOELOGICS has no authority to enter into contracts on behalf of THE WALKING COMPANY or otherwise act for or bind THE WALKING COMPANY. SHOELOGICS agrees that it shall not represent to any third party that it has any such authority.

33 Ownership of Work Product: SHOELOGICS acknowledges and agrees that all worldwide right, title and interest in and to any and all work, product, designs, works of authorship, trademarks, pictorial reproductions, drawings, graphic representations, deliverables, improvements, innovations, discoveries and inventions conceived, made or reduced to practice while performing services under this Agreement (collectively, the "Work Product") shall be the sole property of THE WALKING COMPANY.

34 SHOELOGICS hereby agrees to assign, and does hereby assign, to THE WALKING COMPANY all worldwide right, title and interest in and to the Work Product, including, without limitation, all patent rights, trademarks, service marks, copyrights, trade secret rights and other proprietary rights.

35 THE WALKING COMPANY shall own any results of SHOELOGICS work under this Agreement in its entirety, together with the performances embodied thereon and all the results and proceeds of SHOELOGICS services hereunder throughout the universe in perpetuity, free of any and all claims by SHOELOGICS or any person, corporation, partnership or any other entity deriving any rights from SHOELOGICS.

36 SHOELOGICS agrees to execute additional documentation confirming THE WALKING COMPANY's sole ownership of the Work Product and its underlying intellectual property; to the extent SHOELOGICS does not do so, SHOELOGICS hereby authorizes THE WALKING COMPANY to sign such documents on SHOELOGICS behalf.

37 Confidentiality

"Confidential Information" includes, but is not limited to, all information proprietary to THE WALKING COMPANY, whether or not reduced to writing or other tangible medium of expression, and whether or not patented, patentable, capable of trade secret protection or protected as an unpublished or published work. Confidential Information also includes information relating to the Intellectual Property and Business Practices of THE WALKING COMPANY.

Confidential Information also includes comparable information that THE WALKING COMPANY may receive or has received from others who do business with WALKING COMPANY. Confidential Information does not include information which (a) was already known to SHOELOGICS prior to its contact with THE WALKING COMPANY as established by SHOELOGICS records, (2) becomes generally available to the public other than through a breach of this Agreement, or (3) is furnished to SHOELOGICS by a third party who is lawfully in possession of such information and who lawfully conveys that information.

"Intellectual Property" includes information relating to research and development, inventions, discoveries, development, improvement, methods and processes, know-how, drawings, blueprints, specifications, product briefs, concepts, designs, prototypes, models, samples, screens, moulds, lasts, patents, copyright, trademarks, trade names, trade secrets and patent, trademark, and copyright applications.

"Business Practices" includes information relating to Intellectual Property, business plans, financial information, products, services, manufacturing processes and methods, costs, sources of supply, advertising and marketing plans, customer lists, sales, profits, pricing methods, personnel, and business relationships.

Treatment and Protection of Confidential Information: SHOELOGICS acknowledges that, during the course of their relationship with THE WALKING COMPANY, THE WALKING COMPANY may disclose or SHOELOGICS may learn of Confidential Information. SHOELOGICS agrees to comply with THE WALKING COMPANY's policies and procedures for protecting Confidential Information.

SHOELOGICS agrees that it shall not: (a) use, except as required by the normal and proper course of performing under this Agreement and in SHOELOGICS business relationship with THE WALKING COMPANY, (b) disclose, (c) copy, or (d) allow access to, Confidential Information without the express prior written consent of THE WALKING COMPANY. These restrictions will continue to apply after the completion or termination of this Agreement as long as the confidential nature of the information is maintained. All Confidential Information and media containing such Confidential Information is the property of THE WALKING COMPANY.

Marking Confidential Information: SHOELOGICS shall mark all Confidential Information with legends as specified and required by THE WALKING COMPANY and shall take all actions deemed necessary by THE WALKING COMPANY to protect and perfect THE WALKING COMPANY's rights therein.
Return of property: SHOELOGICS agrees to return to THE WALKING COMPANY promptly upon the completion or termination of this Agreement, or at any other time when requested by THE WALKING COMPANY, all property of THE WALKING COMPANY, including but not limited to all Confidential Information and copies thereof.

Employees and Third Parties: SHOELOGICS shall make its principals and independent contractors aware of the confidentiality obligations of this Agreement. SHOELOGICS shall require its principals, and independent contractors to execute confidentiality agreements in form and substance satisfactory to THE WALKING COMPANY undertaking an obligation of confidentiality comparable to that provided in this Agreement.

38 Representations, Warranties and Indemnification:

SHOELOGICS represents and warrants that (i) it will perform the services required of it hereunder to the best of its abilities and will comply with all instructions issued to it by THE WALKING COMPANY ; (ii) it has the full right, power and authority to enter into and perform this Agreement; (iii) it is not subject to any conflicting obligation which will or might prevent, or interfere with, the execution and

performance of this Agreement; (iv) it shall comply with all of the terms and conditions of this Agreement.

SHOELOGICS represents and warrants that the footwear, materials and components designed and developed under this Agreement will be designed so that they may be manufactured by a variety of manufacturers suitable to THE WALKING COMPANY  and will not be designed solely or exclusively to SHOELOGICS' manufacturing capabilities.

SHOELOGICS represents and warrants that all services provided under this Agreement shall be performed in a timely and professional manner and that SHOELOGICS is competent, qualified and experienced to the extent necessary to perform such services.

SHOELOGICS represents and warrants that SHOELOGICS has and will maintain in force all licenses and permits required of workshop by law or regulation, and SHOELOGICS will fully comply with all local laws, ordinances and regulations applicable to SHOELOGICS.

SHOELOGICS represents and warrants that there are no other agreements, written or oral, conveying to any third party any rights in any work to be created by SHOELOGICS under this agreement.

SHOELOGICS represents and warrants that it will not incorporate in any work to be created under this agreement any designs, works of authorship, trademarks, pictorial reproductions, drawings, graphic representations, improvements, innovations, discoveries or inventions belonging to any third party or in which any third party claims an interest.

THE WALKING COMPANY represents and warrants that (i) it has the full right, power and authority to enter into and perform this Agreement; (ii) it is not subject to any conflicting obligation which will or might prevent, or materially interfere with, the execution and performance of this Agreement; and (iii) it shall comply with all of the terms and conditions of this Agreement.

Indemnification: Each party agrees that it shall indemnify and hold the other party hereto and that party's successors, assigns, affiliates, agents, officers, directors, employees and shareholders, harmless from and against any liability, claim, action, judgment, cost, damage or expense (including reasonable attorneys' fees) arising out of or in connection with any breach or alleged breach by it of any representation, warranty or agreement contained in this Agreement.

## 39 Disputes for products already placed with existing suppliers, or are already in Production already or in transit

SHOELOGICS will not bear any financial liability of possible disputes for any goods that are already in the factory production process or in transit.  This includes orders where materials have been purchased, tooling or molds opened.

Products that are considered below acceptable quality standards due to poor development in the past prior to SHOELOGICS involvement and where it is known that the product is unable to be made to a suitable quality standard in the future.

Products or Purchase orders placed prior to this agreement with SHOELOGICS taking effect that fall under these criterions shown above will be given and agreed with THE WALKING COMPANY.

SHOELOGICS will undertake to achieve the best possible on time delivery dates and quality standards. THE WALKING COMPANY should confirm and attest that product on time % delivery from current suppliers can be expected to be marginal.

40  Entire Agreement: Amendments: This Agreement contains the entire understanding between the parties with respect to its subject matter and supersedes any and all prior agreements, whether oral or written. No amendment or modification shall be of any effect unless it is in writing and duly signed by an authorized representative of each party.

Governing Law: This Agreement shall be governed by the laws of the State of California.  With respect to any disagreement, dispute, controversy or claim arising out of, or relating to, this Agreement or any interpretation of this Agreement, and solely for the purposes of this Agreement, each of the parties to this Agreement irrevocably submits to the exclusive jurisdiction of the courts of the State of California, County of Santa Barbara, or the federal courts for the Central District of California. In addition, each party irrevocably waives, to the extent permitted by law: (i) any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement brought in any such court, (ii) any claim that any such suite, action or proceeding brought in any such court has been brought in an inconvenient forum, (iii) the right to object, with respect to any such claim, suit, action or proceeding brought in any such court, that such court does not have jurisdiction over such party or the other party to this Agreement, (iv) trial by jury, and the parties agree that it is executed and delivered in that state, and any claims arising,  and (v) any requirements for personal service of process or other condition for such party to be subject to a complaint brought hereunder.

No Assignment: This Agreement may not be assigned or delegated by SHOELOGICS in whole or in part without THE WALKING COMPANY prior written consent.

Severability: If any provision of this Agreement should, for any reason, be held invalid or unenforceable in any respect, such provision shall be enforced to the fullest extent possible to effectuate the intent of the parties and the remainder of this Agreement shall be enforced to the fullest extent permitted by law.

Notices: All notices given pursuant to or concerning this Agreement must be in writing and must be given by hand delivery, by overnight mail or by facsimile, to the addresses set forth on page 1 hereof, and shall be deemed given on the date delivered or if sent by facsimile, the day after sending, or if sent by overnight mail, three (3) days after the date of mailing. An address for notice may be changed from time to time by either party by giving notice as provided herein.

Headings: Headings are used in this Agreement as a matter of convenience only and shall have no bearing on the interpretation of this Agreement.

Force Majeure: No party shall be liable for any failure to perform its obligations in connection with any action described in this Agreement, if such a failure results from any act of God, riot, war, terrorism, civil unrest, flood, earthquake, or cause beyond such party's reasonable control (including any mechanical, electronic, or communications failure, but excluding failure caused by a party's financial condition or negligence).

Governing Language: This Agreement has been written and executed in English. In the event any translation of this Agreement into another language is made, the English language version of this Agreement shall govern in case of any conflict.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date written below:

For and on behalf of:                    For and on behalf of:

**SHOELOGICS**                           **THE WALKING COMPANY**

By:                                      By: *Susie Minier*

Name:                                    Name: *Susie Minier*

Title:                                   Title: *Senior Vice President*

Date:                                    Date: *8-21-12*

APPENDIX A INSPECTION LOTS

| LOT SIZE | SAMPLE QTY | PAIRS NEEDED | maximum allowed faults | | |
|---|---|---|---|---|---|
| | | | Major | Minor | Total |
| | | | Defect Q'ty | Defect Q'ty | Defect Q'ty |
| UNDER 500 | 50 | 4 PRS * 12 CASES 2PRS * 1 CASES | 2 | 4 | 6 |
| 501 ~1200 | 80 | 4 PRS * 20 CASES | 3 | 6 | 9 |
| 1201 ~3200 | 125 | 5 PRS * 25 CASES | 5 | 9 | 14 |
| OVER 3200 | 150 | 5 PRS * 30 CASES | 6 | 11 | 17 |

APPENDIX B LIST OF FATAL FLAWS THAT REQUIRE 100% INSPECTION

| FATAL DEFECTS, 100% REINSPECT IF FOUND | |
|---|---|
| 1 | NAILS, TACKS, SEWING NEEDLES, INSIDE SHOE |
| 2 | MAJOR ADHESION SEPARATION (OUTSOLE/MIDSOLE/UPPER) |
| 3 | PRODUCT DOES NOT FOLLOW SPECIFICATION |
| 4 | INSIDE LINING PLEATED, BUMPS AND RIDGES |
| 5 | MAJOR CONSTRUCTIONAL PROBLEMS, STITCHING, METALWORK |

APPENDIX C,
TRAVEL CLAIM OUTLINES, *for employee living in Guangdong province full time contracted.*
Covers all areas of Guangdong province

| Item | Duration | claim | Totals estimated | Comments, all shown in USD |
|------|----------|-------|------------------|----------------------------|
| Hotel | Per stay | Per night | 45-60$ | regular room rates ,normal tourist hotel |
| food/drink | Per day | bills | 20-25$ | Per overnight stay only. |
| taxi/ferry/bus | as reqd | as reqd | 30-45$ | Local transport as required, receipts given |
| Misc | as reqd | as reqd | 10-15$ | phone bills, ticket entry miscellaneous charges |
| entertainment | None | none | 0$ | |

APPENDIX D Foreign travel expenses

Any travel that requires flights to different countries, including the USA shall be preagreed with THE WALKING COMPANY before the travel commences

Confidential                    Page 11 of 11                    21 August 2012